## CASE NO. 09-2055

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

PAMELA ARMISTED, Guardian
of JONATHON BOYCE, a minor,
by Pamela Armisted, Guardian;
KATHLEEN CHAUVIN, Parent and
Guardian of JOSEPH CHAUVIN;
JERRY WAGNER, as Brother and
Guardian of LESLIE STEWART;
EILEEN ADAMS, as Guardian of
JOSHUA ADAMS and HAROLD
ADAMS; and GARY PARKS, as
Guardian of TOWANDA PARKS,

    Plaintiff-Appellants            Appeal from the United States
                                     District Court, Eastern District
v.                                 of Michigan, Southern Division

STATE FARM MUTUAL           Lower Court No.
AUTOMOBILE INSURANCE      2:07-cv-10259
COMPANY,

    Defendant-Appellee.

_____/

## PLAINTIFF-APPELLANTS' CORRECTED BRIEF ON APPEAL APPEAL, REDACTING CONFIDENTIALMATTERS SEALED IN DISTRCIT COURT

## **ORAL ARGUMENT REQUESTED**

### CERTIFICATE OF SERVICE

LAW OFFICES OF LARRY A. SMITH
  BY: LARRY A. SMITH (P27989)
  *Attorney for Plaintiff-Appellants*
  24750 Lahser Road
  Southfield, MI 48033
  (248) 358-3920

# CASE NO. 09-2055

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

PAMELA ARMISTED, Guardian
of JONATHON BOYCE, a minor,
by Pamela Armisted, Guardian;
KATHLEEN CHAUVIN, Parent and
Guardian of JOSEPH CHAUVIN;
JERRY WAGNER, as Brother and
Guardian of LESLIE STEWART;
EILEEN ADAMS, as Guardian of
JOSHUA ADAMS and HAROLD
ADAMS; and GARY PARKS, as
Guardian of TOWANDA PARKS,

    Plaintiff-Appellants

v.

STATE FARM MUTUAL
AUTOMOBILE INSURANCE
COMPANY,

    Defendant-Appellee.

Appeal from the United States
District Court, Eastern District
of Michigan, Southern Division

Lower Court No.
2:07-cv-10259

_____/

## PLAINTIFF-APPELLANTS' CORRECTED BRIEF ON APPEAL APPEAL, REDACTING CONFIDENTIALMATTERS SEALED IN DISTRCIT COURT

## **ORAL ARGUMENT REQUESTED**

### CERTIFICATE OF SERVICE

LAW OFFICES OF LARRY A. SMITH
BY: LARRY A. SMITH (P27989)
*Attorney for Plaintiff-Appellants*
24750 Lahser Road

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: _____        Case Name: _____

Name of counsel: _____

Pursuant to 6th Cir. R. 26.1, _____
                                                                  *Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
      identity of the parent corporation or affiliate and the relationship between it and the named
      party:

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
      in the outcome?  If yes, list the identity of such corporation and the nature of the financial
      interest:

---

CERTIFICATE OF SERVICE

I certify that on _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/_____

_____

_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# <u>TABLE OF CONTENTS</u>

**<u>PAGE</u>**

TABLE OF AUTHORITIES                                        iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT              vi

JURISDICTIONAL STATEMENT                                1

STATEMENT OF ISSUES PRESENTED                       2

STATEMENT OF THE CASE                                  3

STATEMENT OF FACTS                                     5

SUMMARY OF ARGUMENT                                    68

ARGUMENTS:

    I.    THE JURY'S VERDICT AS TO PLAINTIFFS'
        NO-FAULT CLAIMS WAS AGAINST THE
        OVERWHELMING WEIGHT OF THE EVIDENCE,
        AND THE TRIAL COURT ERRED IN DENYING
        PLAINTIFFS' MOTION FOR NEW TRIAL              69

        STANDARD OF REVIEW                           69

    II.   THE TRIAL COURT ERRED IN FAILING TO
        GRANT A DEFAULT JUDGMENT FOR
        DEFENDANT'S WILLFUL ABUSE OF
        DISCOVERY                                    82

        STANDARD OF REVIEW                           82

CONCLUSION                                             89

CERTIFICATE RE COMPLIANCE                              90

CERTIFICATE OF SERVICE                                 92

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

Bank One of Cleveland, N.A. v Abbe                                            84, 85, 86
916 F2d 1067 (CA 6 1990)

Booth v Auto-Owners Ins. Co.                                                  77
224 Mich App 724; 569 NW2d 903 (1997)

Brown v Eller Outdoor Advertising Co.                                        80
111 Mich App 538; 314 NW2d 683 (1981)

Buntea v State Farm                                                          77
2007 WL 3275053 (ED MI)

Burris v Allstate Ins. Co.                                                   76
480 Mich 1081; 745 NW2d 101 (2008)

Denholf v City of Grand Rapids                                              78
494 F3d 534 (CA 6 2007)

Filion v Art Himbolt Trucking Co.                                           80
103 Mich App 471; 302 NW2d 892 (1981)

Grand Valley Health Center v Amerisure Ins. Co.                             79
262 Mich App 10; 684 NW2d 391 (2004)

Hawley v Dresser Industries, Inc.                                           78
958 F2d 720 (CA 6 1992)

Holmes v City of Massilon, Ohio                                             78
78 F3d 1041 (CA 6 1996)

In re Grand Jury Investigation No. 83-2-35                                  85
723 F2d 477 (CA 6 1983)

J.C. Wyckoff & Associates v Standard Fire Ins. Co.                          81
936 F2d 1474 (CA 6 1991)

Manley v DAIIE                                                      76
127 Mich App 444; 339 NW2d 205 (1983)

McDonald v Petree                                               69, 81
409 F3d 724 (CA 6 2005)

McKelvie v Auto Club Ins.                                          79
203 Mich App 331; 512 NW2d 74 (1994)

Michigan Window Cleaning Co. v Martino                            87
173 F2d 466 (CA 6 1949)

Miller v Farm Bureau Mut. Ins. Co.                                75
218 Mich App 221; 553 NW2d 371 (1996)

Mitchell v Boelke                                                 69
440 F3d 300 (CA 6 2005)

Morales v State Farm Mut. Ins. Co.                                86
279 Mich App 720; 761 NW2d 454 (2008)

Morris v Bd. of Education                                         80
243 Mich App 189; 622 NW2d 66 (2000)

Nasser v Auto Club Ins. Ass'n.                                    76
435 Mich 33; 457 NW2d 637 (1990)

Pauley v United Operating Co.                                     87
606 FSupp 520 (ED MI 1985)

Proudfoot v State Farm                                            76
469 Mich 476; 623 NW2d 739 (2003)

Shawmut Boston Intern. Banking Corp. v Duque-Pena                 87
767 F2d 1504 (CA 11 1985)

Shearson Loeb Rhoades, Inc. v Quinard                             87
751 F2d 1102 (CA 9 1985)

Taylor v Teco Barge Line, Inc.                                    78
517 F3d 372 (CA 6 2008)

Tennant v State Farm                                              79
143 Mich App 419; 372 NW2d 582 (1985)

Tisdale v Federal Express Corp.                                  82
415 F3d 516 (CA 6 2005)

Trans World Airlines, Inc. v Hughes                              87
332 F2d 602 (CA 2 1964)

Van Marter v American Fidelity Fire Ins. Co.                     75
114 Mich App 171; 318 NW2d 679 (1982)

Visconti v DAIIE                                                 75
90 Mich App 477; 282 NW2d 360 (1979)

## **STATUTES AND COURT RULES**

F R CivP 37                                                     82

MCL 500.3101                                                  75, 83

MCL 500.3107                                                     75

MCL 500.3142                                                  72, 86

MCL 500.3148                                                     87

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This action involves the claims of not one but *six* plaintiffs, each of whom sustained a traumatic brain injury ("TBI") in the course of an automobile accident. Each of them claim attendant care benefits under the Michigan No-Fault Act, based on the complex nature of their own particular injuries, condition, medical treatment and testimony and individual need for such care.  The facts and evidence relating to each of their claims is nothing short of crucial in light of the fact that the primary issue in this appeal is whether the jury's verdict, reached after less than one full day of deliberation after four weeks of trial, the testimony of 41 or more witnesses (encompassing 4,000+ pages of transcript) and introduction of hundreds of exhibits, is against the great weight of the evidence.  Oral argument is thus essential to assist the court in its consideration of that evidence and reaching a fully informed ruling.

## **JURISDICTIONAL STATEMENT**

This case was originally filed on November 22, 2006 in the Oakland County Circuit Court (R.E.# 1, Notice of Removal and Exhibit A [Complaint].  On January 16, 2007, it was removed to the United States District Court for the Eastern District of Michigan, Southern Division, pursuant to 28 USC sec. 1446(a) (Id., Paragraph 8, p2).  The District Court's jurisdiction was premised on 28 USC sec. 1332 (Id.). The original plaintiff, Pamela Armisted, was a resident of the Michigan County of Ingham (Id., Paragraph 5, p2), while Defendant is an Illinois Corporation with its principal place of business in Bloomington, Illnois (Id., Paragraph 4, p2).

This appeal is from a final decision of the aforementioned District Court.  This Court has jurisdiction under 28 USC sec. 1291 and 1294(1).

## <u>STATEMENT OF ISSUES PRESENTED</u>

I.    DID THE TRIAL COURT ERR IN DENYING PLAINTIFFS' MOTION FOR NEW TRIAL ON THE BASIS THAT THE JURY'S VERDICT AS TO PLAINTIFFS' NO-FAULT CLAIMS WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?

The District Court answered "No."

Defendant-Appellee would answer "No."

Plaintiff-Appellants state that the answer is "Yes."

II.   DID THE TRIAL COURT ERR IN FAILING TO GRANT A DEFAULT JUDGMENT IN PLAINTIFFS' FAVOR FOR DEFENDANT'S ABUSE OF DISCOVERY?

The District Court answered "No."

Defendant-Appellee would answer "No."

Plaintiff-Appellees state that the answer is "Yes."

## STATEMENT OF THE CASE

This appeal arises out of an action brought by six different plaintiffs, each of whom suffered catastrophic, traumatic brain injuries, as well as other injuries, both physical and psychological in nature, arising out of the use and operation of motor vehicles. Plaintiffs' claims consequently originate under the Michigan No Fault Insurance Act, and involve primarily their right to attendant care benefits as allowable expenses incurred as reasonable and necessary services for their care, recovery and rehabilitation under MCL 500.3107(1)(a). Each of the Plaintiffs has had to sue Defendant of payment of No-Fault benefits on at least one prior occasion, resulting in agreements establishing reasonable rates for attendant care benefits. Defendant, however, rather than continuing to pay the benefits owed, improperly eliminated or reduced the amount of the benefits being paid in each case based not on the fact that such actions were appropriate, but on Defendant's desire to reduce the percentage of the dollars it took in which were being paid out on legitimate claims. In fact, Defendant instituted a program called "ACE," which was intended to "capture an opportunity" to reduce indemnity payments in the area of catastrophic personal injury protection benefits in Michigan alone by $30,000,000.00 annually. Plaintiffs filed this action to recover the attendant care benefits that they were entitled to, which Defendant had ceased to pay.

Plaintiff filed suit in Oakland County Circuit Court.  State Farm removed the case to the United States District Court of the Eastern District of Michigan, Southern Division.  During pretrial proceedings, Plaintiff filed a motion for default judgment on the basis of Defendant's continuing, deliberate and willful resistance to discovery requests.  Default was denied as a sanction, although the lower court ordered that substantial monetary sanctions were to be imposed (which has not occurred to date).  After four weeks of trial and approximately 4,000 pages of testimony from 41 or more witnesses, the jury returned a verdict of no cause for action, determining that no allowable no-fault expenses were incurred.  Judgment for Defendant was subsequently entered.  Plaintiffs filed a timely motion for new trial in pertinent part here on the basis that the verdict was against the overwhelming weight of the evidence, which was denied by the trial court without actually weighing the evidence.

Plaintiffs appeal to this Court from the trial court's denial of their motion for new trial on the above basis and from its denial of their motion for default judgment.  The facts regarding each Plaintiff's claim and State Farm's treatment of same follow below, in sufficient detail to allow this Honorable Court to make a fully informed ruling regarding the former issue.

## STATEMENT OF FACTS

Plaintiffs filed their First Amended Complaint (R.E.#24) on behalf of all

Plaintiffs in this matter on 10/3/07, alleging that State Farm Mutual Automobile

Insurance Company ("State Farm") had engaged in a common plan and scheme to

deprive them of the proper payment of insurance benefits through methodically

breaching the contractual duties owed to them without basis in law or fact in

violation of the Michigan No-Fault Act.  A discussion of the evidence with regard

to their injuries, condition and entitlement to benefits, as well as Defendant's

treatment accorded each claim in sufficient detail to enable this Court to render a

fully informed decision with regard to the issue presented in Argument I follows

below.

## LESLIE STEWART

Leslie Stewart sustained severe brain damage in an auto accident on 9/11/95,

which left him in a coma for almost a month following the accident, and also a

fractured hip and ankle (R.E.#387, trial trans. pp 93-95, 98-99; R.E.#386, trial

trans. p 341).  As a result of this traumatic brain injury ("TBI"), he is confused

and often disoriented, has great difficulty comprehending and communicating

effectively, his left side is paralyzed and he cannot use the left side of his body

at all (although the right side of his body is unaffected).  He is also bladder and

bowel incontinent and requires diapers which may require changing at almost any time (R.E. #387, trial trans. pp110-111, 133; R.E. # 386, trial trans. pp 342-343; R.E. #381, trial trans. p 1021; R.E.# 375, trial trans. pp 1702, 1704-1705). Due to the TBI, he is subject to unpredictable mood swings and angry outbursts which may occur at any time.  Thus, he may often be aggressive and physically/ verbally abusive, or loud and disruptive towards his care providers or members of the public (R.E.#387, trial trans. pp117-122, 145; R.E.#386, trial trans. pp 346, 349, 380; R.E.# 381, trial trans. pp 988-989, 995-996).  The effects of the TBI he suffered in the auto accident are permanent in character (R.E.# 387, trial trans. pp165-166). While he is confined to a wheelchair during his usual waking hours, he is a physically large man, and is still capable of and at times inclined to strike out at a caregiver attempting to have him do something related to his care which he is not willing or ready to do (R.E.#387, trial trans. pp103, 111-112).

Leslie was institutionalized for years (R.E.#387, trial trans. pp 99, 102) until his brother, Jerry Wagner and Jerry's wife, Sandia, made the decision to first start bringing him into their home on weekends and subsequently to provide care for Leslie at home on a permanent basis after it had become apparent that the institution responsible for his care was keeping him heavily medicated in

order to comfortably work with him (R.E.#387, trial trans. pp106-108, 110, 117, 986).

Leslie's treating physician, Dr. Todd Best, is a medical doctor specializing in physical medicine and rehabilitation. Dr. Best has treated patients suffering traumatic brain injuries ("TBI's") for 18 years (R.E.#386, trial trans. pp 338-340). Leslie is not capable of attending to his own daily needs at all ( R.E.#387, trial trans. pp 145-147), and requires two caregivers to be present at any given time. At 210-215 pounds, he is too large and incapable of assisting at all in things such as transfers, so the process of getting him in and out of his wheelchair, in and out of bed, and on and off the toilet requires 2 people. Per Dr. Best, he is most likely transferred about ten times per day. RN Renee LaPorte testified that it cannot be predicted when a transfer might need to be made, so two people have to be available to provide physical care in this respect at all times (R.E.#375, trial trans. pp 1702, 1704-1705). In addition, by the testimony of Jerry and Sandia Wagner, one caregiver is required to literally pick him up and hold him in place while the other administers the particular care he may require at the moment, be it washing or grooming, changing his clothes, or changing his diapers. Further, two people are required to administer his physical therapy. Because of the unpredictability of his behavior, with its ever-present threat of aggressive resistance to care being provided, even relatively

7

simple things like shaving can require two caregivers to be present.  He cannot do anything for himself, and when he is in a mood to resist, any aspect of his care can become very, very difficult (R.E.#387, trial trans. pp 130-131, 136-138, 140-141, 157-158; R.E.#386, trial trans. p 343; R.E.#381, trial trans. pp 1004-1006).  Consequently, even with regard to his physical care, per Dr. Best, Leslie requires two caregivers around the clock and this physician has written prescriptions for attendant care by two persons 24 hours per day (R.E.#386, trial trans. p 344) which have been conveyed to State Farm on numerous occasions (R.E.#387, trial trans. pp 130-131).  The current care team consists of Brenda Moore, Anthony Thomas, Jerry and Sandia Wagner and Leslie's mother, in shifts, around the clock (R.E.#387, pp 132-133).

Part of the reason for Dr. Best's prescription for 24-hour/day care is that he doesn't really sleep—he may be "out" for an hour or two, but is up and awake most of the night.  At such times, he is also prone to fits of rage and/or to hallucinations, speaking to people who aren't there.  Since some of this activity produces fear, a caregiver must be available to calm him down, allay those fears, understand what is happening and help him focus on reality (R.E.#387, trial trans. pp 144-145; R.E.#386, trial trans. pp 346-347; R.E.#381, trial trans. pp 990-991).

Leslie's care also requires far more than merely attending to his physical needs, a difficult task in and of itself.  His caregivers must constantly also do their utmost to keep his mood on an even keel, to try and entertain him and maintain a good frame of mind, and to calm him down and redirect his mood and/or behavior when he is angry and upset.  In short, they must be able to manage his behavior and deal with his moods effectively, sometimes letting him cool off, think about what has to be done and utilize a more flexible timetable for the daily care he requires.  Leslie's behavior may require attention and redirecting from the caregiver at any time, day or night, so a qualified caregiver must always be available.  Caregivers must understand that the cognitive and emotional difficulties Leslie presents in this regard are a result of his TBI.  The ability to successfully perform such tasks requires significantly greater skills than merely the ability to assist Leslie in physically performing the care he needs. Treating physician Dr. Best and Plaintiff's expert RN/case manager Renee LaPorte each testified that the level of care demanded of an attendant care provider for Leslie is thus that of a life skills trainer/behavioral technician.  Renee LaPorte testified that because of the cognitive/emotional issues arising as a result of a TBI, no care giver having less than the skills of a life skills trainer is ever qualified to care for TBI patients (R.E.#387, trial trans. pp 111-112, 158; R.E.#386, trial

9

trans. pp 346-347, 349-353, 360, 363-364, 377-378, 380-381; R.E.#381, trial trans. pp 1006-1007, 1023, 1030; R.E.#375, trial trans. pp 1702, 1705-1706, 1795).

Over the years his family and other regular caregivers have acquired such skills and are generally able to manage his behavior.  LaPorte, who prepared several extensive attendant care evaluations of Leslie Stewart in 2001 and 2008, testified unequivocally that the caregivers attending Mr. Stewart could qualify with any home care agency to be life skills trainers on the basis of their many years of experience with Leslie.  Per Dr. Best, Leslie has been receiving the appropriate level of attendant care from his caregivers.  His violent mood swings have consequently become much less of a problem, and he has become much more responsive and in tune with things going on around him.  While the residual effect of his TBI are permanent in nature and he is not going to make any further recovery, this kind of care is necessary to maintain the functional capacity he has (R.E.#387, trial trans. pp 111-112, 119-122, 127, 150-154; R.E.#386, trial trans. pp 351-352, 358-359, 360, 367-369, 379; R.E.#381, trial trans. p 1007; R.E.#375, trial trans. p 1797).


**STATE FARM'S TREATMENT OF THE STEWART CLAIM**

The instant action is not the first time Jerry Wagner has had to sue State Farm for attendant care benefits on behalf of Leslie Stewart (R.E.#387, trial trans. p125).  Plaintiff's Exhibit 153 (R.E.#430) was a settlement agreement entered into between Wagner on Leslie's behalf and State Farm in 2002. It arose out of a disagreement with State Farm and subsequent litigation over attendant care benefits, and specified an amount Defendant promised to pay for such benefits, plus family-provided guardianship, conservatorship service and case manager services, with the amount going up over time. While the settlement agreement indicates that State Farm agreed to pay $575/day through 8/31/05, Defendant continued to pay that amount thereafter from 9/05 until 10/2007.  Payment of attendant care and other benefits in that amount were determined by State Farm to be appropriate for the reasonable and necessary expenses incurred for the care, recovery and rehabilitation of Leslie Stewart, and in fact, *all* of that amount went to the care, recovery, and rehabilitation of Leslie, with $504 being expended *daily* in labor care costs alone.  State Farm conceded or was forced to acknowledge at trial that his care needs had not changed through at least April, 2008, that Stewart would continue to require attendant care for the rest of his life, and that the amount of $575/day represented the value for the care which had been *actually incurred* by Leslie Stewart through the time of

the agreement and thereafter, during the time such payments continued to be made (R.E.#387, trial trans. pp119, 124, 159-160, 162-165, 169-171, 181, 201-204, R.E.#420, Kuzmanko dep., pp 189-191, 194; R.E.#410, T. Stein dep., pp 655, 741-742, 748-750, 756-758; R.E.#382, trial trans. p 731, 798-799, 803-805; R.E.#441, Proctor dep., pp 113-114).

In addition, the 2002 settlement agreement also *obviated* the responsibility of Leslie Stewart's caregivers to provide documentation regarding the attendant care services being provided to him. Instead [and obviously in light of the permanent nature of Leslie's condition], the agreement only required that Jerry Wagner report to State Farm if Stewart was hospitalized, institutionalized or otherwise domiciled and kept outside the home in excess of seven days. That portion of the agreement expressly stated that it was "by way of additional consideration," contained no time limitation whatsoever, and was extremely important to Jerry and Sandia Wagner for the reason that Leslie's care requirements were permanent and not subject to change over time at all. State Farm paid attendant care benefits without any documentation being provided to detail the care being given from that date through 2007, establishing the fact that this latter portion of the agreement was not subject to expiration on 8/31/05 (R.E.#430,Plaintiff's Exhibit 153; R.E.#387, trial trans. pp 165-166;

R.E.#381, trial trans. pp 993-994; R.E.#376, trial trans. pp 1575-1576, 1578; R.E.#371, trial trans. p 2366; R.E.#410, T. Stein dep., pp 742-743).

State Farm understood quite well from medical reports and documentation within its claim file the permanent nature of Leslie Stewart's condition, his care requirements as set forth above and the fact that no change in either was expected to occur.  No doctor had ever given any contrary opinions to Defendant in any respect.  Moreover, it conceded that Stewart had received the care required and that it owed attendant care and other benefits to Stewart for the care his caregivers were providing to him as reasonable and necessary benefits under the Michigan No-Fault statute.  Ron Ikens, Defendant's Claim Team Manager, admitted that State Farm knew that Leslie Stewart probably couldn't have survived without receiving the attendant care he needed, and that State Farm's own surveillance established he was receiving care (R.E.#382, trial trans. pp 695-697, 735, 755, 767-768, 770-774, 809-810, 819, 823-824, 828, 831-833, 838-839, 841-842, 846-850; R.E.#381, trial trans. pp 907-910, 916-920, 930-937, 947-950, 959-961, 964-965; R.E.#376, trial trans. pp 1553,1566-1567, 1569-1573, 1577, 1579, 1586; R.E.#410, T. Stein dep., 646-648, 651-652, 657-661, 663-664, 717-721, 723-736, 745-747, 759, 774-775, 777, 786-790)!

However, despite the fact that the level of attendant care that had been prescribed for Leslie Stewart was that of a life skills trainer and that every source of actual information State Farm had in its claim file indicted that two-person care was necessary, Defendant conducted a so-called "market survey" on or before April 16, 2007 by making "cold calls" to three health care agencies to determine the rate they would charge *not for a life skills trainer, or for two-person care at any level,* **but for a single caregiver with a significantly lower skill set, a home health aide. State Farm admitted, through its claims rep then handling the file, that it had no basis to even assume that a home health aide would be capable of providing adequate care for a severely brain-injured person such as Mr. Stewart. Further, Defendant didn't even bother to inform anyone at the agencies "surveyed" of Leslie's condition and specific care needs.** The results of Defendant's "survey" indicated that an appropriate rate of compensation for Stewart's care *for a single care giver would be just $11.34/hr., or $272.16/day,* a reduction in attendant care benefits of more than 50%. On April 16, 2007, State Farm's claim representative wrote Plaintiff's attorneys, unilaterally threatening that Defendant would reduce the amount of attendant care benefits paid to that lower level, and purporting to require Wagner to resume submission of State Farm's own attendant care forms, a requirement not

only obviated by the previous settlement agreement, but also one that State

Farm has admitted is not required for the payment of benefits under the

Michigan No-Fault Act (R.E.#419,T. Stein dep., pp 596-598, 689-691, 695-

701, 707-709, 713, 715-716, 742-743; R.E.#371, trial trans. p 2364).

   In fact, representatives of the health care agencies State Farm allegedly

"surveyed" for the appropriate rate of compensation for Stewart's care needs

uniformly testified that a home health aide would be incapable of satisfying

Leslie's care requirements and that in any event, they would not send out a

lesser-skilled caregiver than the life skills trainer his treating physicians had

indicated was essential for his care.  Each confirmed that no one from State

Farm had ever even discussed Leslie Stewart's condition/care requirements

with them, and they certainly did not expect that rates quoted for home

health aides in the abstract would ever be utilized by Defendant as a basis

for establishing the value for the care Leslie requires.  The rates quoted by

State Farm to Plaintiff's counsel would be completely inappropriate as

compensation for the level of care Stewart requires, which would be that of a

life skills trainer.  It would not even be possible to provide an appropriate

care giver for the amount State Farm proposed to pay.  Further, these

agencies would not send out a single caregiver where two were necessary to

perform patient transfers (R.E.#442,P. Semian dep., pp 7-9, 11-15, 23-24,

28-30, 32-33, 52-53; R.E.#444, W. Roe dep., pp 6-7, 10, 43-45, 49-57, 61, 72-73, 75-77, 81-83, 87-88, 91).

Ruthann Tuttle became the adjustor regarding the Stewart claim in October, 2007, after it went into litigation. Tuttle did little or nothing to familiarize herself with the contents of Defendant's enormous claim file and wealth of information it contained relating to Leslie, and did not even attempt to discuss the claim with those previously handling the claim after taking it over, practices directly contrary to Defendant's professed usual claims handling procedure. She also made no attempt to discuss the claim with Stewart's treating doctors, although she was still required to adjust the claim during the time it was in litigation. **Tuttle paid nothing in attendant care benefits after she took the claim over in 10/07 through 1/08.** Incredibly, and directly contrary to the wealth of information collected in Defendant's own file and determinations made by State Farm over years of adjusting this claim, Tuttle wrote at least five letters to Plaintiff's counsel stating that it was questionable whether Leslie had sustained accidental bodily injury and/or whether the treatment he had received over the years was reasonable, necessary and related to the 9/11/95 motor vehicle accident within the meaning of the Michigan No-Fault Statute. Tuttle subsequently testified alternatively that these statements were made in error or with the

16

intention of preserving State Farm's defenses to the claim, despite the fact that they lacked merit (Exhibits RRR 4,5,6,7,& 15; R.E.#382, trial trans. pp 706, 714-720, 729, 735-747, 749-751, 754-763, 769-771, 781; R.E.#381, p 888; R.E.#376, trial trans. pp 1562-1564, 1577-1578; R.E.#371, trial trans. pp 2429-2430; R.E.#415, S. Schreurs dep., pp 120-122; R.E.#414, T. Iler dep., pp 71, 74-75; R.E.#420, K. Kuzmanko dep., pp 63, 69, 85-86; R.E.#437, D. Callahan dep., pp 43-44; R.E.#441, R. Proctor dep., pp 106-107).

Even after Tuttle resumed paying attendant care benefits, they were made for a single caregiver, contrary to Stewart's treating physicians' prescriptions for two-person care, and were made at the rate of compensation various home health aides would earn, despite the fact that such caregivers would not even be competent to care for Leslie Stewart in light of his profound physical needs and emotional/cognitive deficits. Despite her admission that she was not an expert in the areas of attendant care or the levels of attendant care that exist, Tuttle refused to even accept the existence of [a more expensive] life skills trainer [Renee LaPorte, an RN and experienced case manager whom Tuttle acknowledged *was* an expert in those areas, testified that care provided at that level had a fair market value of $30/hr.], and went with her own preference regarding the appropriate

level of care, with its lesser rate of compensation, contrary to the medical evidence and qualified lay testimony. In what was perhaps a rare bit of candor, Tuttle admitted that even if all treating doctors testified that the level of care required was that of a life skills trainer and all of the caregivers met that level, she still would not pay attendant care benefits at a rate appropriate to compensate such caregivers (R.E.#381, trial trans. p 979)!  Similarly, Tuttle preferred to simply ignore the overwhelming abundance of evidence in the form of Stewart's treating doctors' prescriptions, sworn deposition testimony of each of his caregivers and video evidence from its own surveillance establishing that two-person care was required, and issue attendant care benefits checks for a single caregiver only (R.E.#382, trial trans. pp 731-733, 770-774, 809-814, 833-834, 839-841, 843, 846-851; R.E.#381, trial trans. pp 892, 913-915, 921, 924-927, 941-944, 953-954, 956-958, 976-979; R.E.#376, trial trans. pp 1559-1560, 1567-1573, 1589-1590).

Perhaps it is not surprising that when Tuttle did resume paying attendant care benefits after Jerry Wagner's deposition, albeit at the lower level she personally felt was appropriate, she made the check which covered the period of October, 2007 to February, 2008 payable to the wrong payee not

once, but three times over the span of more than a month and a half (R.E.#382, trial trans. pp 781-790; R.E.#381, trial trans. p 888).

Tuttle attempted to justify State Farm's failure to pay any attendant care benefits at all from 10/07 through 1/08 and to pay for two-person care rather than for a single caregiver on the basis of Jerry Wagner's failure to fill out Defendant's own attendant care forms. Despite the fact that it had an abundance of the very same information in much more detailed fashion in the form of its own enormous claim file and the later depositions under oath of Jerry Wagner, Sandia Wagner, Brenda Moore and Anthony Thomas, Leslie's caregivers, with respect to the care being provided, State Farm insisted that because its own attendant care form had not been filled out, it lacked sufficient documentation to initially pay any portion of the claim at all, and subsequently to pay for two-person care. However, Ron Ikens, State Farm Claim Team Manager and Tuttle's supervisor, unequivocally testified that notwithstanding the fact that Defendant's own forms had not been submitted, he assumed that Stewart was indeed receiving the care he required and that State Farm's own surveillance established that. Indeed, Ikens knew that care was being provided everyday, 24 hours per day. He was unable to identify any substantive information State Farm lacked after the depositions of Leslie's caregivers were taken. With regard to the two-

person care the proofs clearly indicated Stewart required, both Tuttle and Ikens could only state that they "didn't know" whether Defendant owed benefits for such care. Defendant has never paid for the required two-person care (R.E.#382, trial trans. pp 813-814, 823-824, 838-839; R.E.#381, trial trans. pp 873-879, 881-882, 888-890, 896, 913-921, 924, 930-938, 949-950, 956-958, 972; R.E.#376, trial trans. pp 1560-1561, 1564-1565, 1573, 1578-1579, 1587-1589, 1594, 1595-1597).

As a consequence of Defendant's reduction in and failure to pay the attendant care benefits owed, the Wagners were unable to properly compensate Leslie's non-family caregivers, Brenda Moore and Anthony Thomas, paying them only what they could afford (which at times was nothing at all) and in lieu thereof, provided room and board as part of their compensation package. At the time State Farm was paying nothing in benefits, Jerry Wagner was forced to take out a line of credit to try to sustain Leslie's staff of caregivers. In addition, they promised to pay them a reasonable share of whatever recovery of benefits they might ultimately make as a result of this litigation (R.E.#387, trial trans. pp 128-129, 169-171, 206-207; R.E.#381, trial trans. pp 992-993, 997-998, 1024-1026).

## **JONATHON BOYCE**

20

Jonathon Boyce was just 15 years old when he suffered a serious brain injury on 12/13/02. Residual effects of the TBI include disruption of cognitive function dealing with memory, learning new things, retention of information, impulse control, planning, initiating activity, ability to think in a clear and logical manner, organization and exercising good judgment. Additional neurological deficits included Mr. Boyce's inability to view himself as cognitively impaired, and to grasp his limitations. Consequently, he has poor impulse control, and is unable to curtail impulses that a normal person would be able to resist, which leads to unsafe or problematic behavior, as well as outbursts of anger all out of proportion to the triggering event. Boyce's sleep patterns have also been disrupted, leading him to occasionally get up and leave in the middle of the night. He is disorganized and unable to control himself, unable to act with the proper discretion in his own behalf and uncertain what to do in various situations. The effects of the injury are compounded by the fact of Boyce's young age. A fifteen-year-old suffering such an injury tends to have his mental development stuck in an adolescent state, with the brain damage preventing him from assimilating the skills necessary for adult behavior. While Jonathon's development may continue, it will be deficient compared to his peers. Consequently, he actually requires 24-hour attendant care from a caregiver who has the skills

21

to manage his troubling behavior at any time it might occur, day or night, to distract him and talk him down when he gets worked up, to interact with him to diffuse rather than increase built-up tension and to remove him from situations posing the potential for a loss of control without hurting his feelings or arousing his anger.  His caregiver must be able to deal with his impulsivity and tendency towards poor decision-making.  Jonathon's caregiver must therefore have the skills of a life skills trainer or behavioral technician in order to manage his behavior, a skill set which goes well beyond the capacities of a home health aide, and which, contrary to State Farm's self-serving, slanted view of the matter, is in fact very well accepted in the psychiatric and rehabilitation community, as evidenced not only by the testimony of Boyce's own physicians, but also by the fact that a number of health care agencies specifically offer them  There is no question that Pamela Armisted, Jonathon's mother and sole caregiver, is able to function quite well in this capacity, due to her training in constantly interacting with his treating physicians in this regard and emotional connection to him.  Hers is, however, a very difficult task, as it involves dealing with someone with the body of a 20-year old with the mind and impulse control of a much younger child.  The task is compounded by the fact that Boyce's behavioral difficulties will arise on an entirely unpredictable basis.  While there may be

extended periods when undesirable behavior does not occur, the potential for such difficulties to become manifest is always present, day or night, and the required skilled caregiver must always be available to deal with them should they occur.  Accordingly, the cost of providing the services of a life skills trainer is significantly greater than that of a home health aide of any level, coming in at approximately $30/hr. in the healthcare marketplace (R.E.#439, Dr. Meeland dep., pp 9-10, 12-13, 18-21, 43-44, 47-50, 76-80, 84-93, 96, 98, 113-117, 128-131; R.E.#419, Dr. Fankhauser dep., pp 7-9, 17, 27 , 19, 32, 37-41, 45-46, 62-63, 70-71, 74-80, 82, 94-95, 97-98, 100-101, 113-114; R.E.#387, trial trans. pp 229, 232-233, 236-239, 243-247, 250, 252-254, 256, 258-266; R.E.#386, trial trans. pp 313, 315, 325-327, 333; R.E.#375, trial trans. pp 1630-1637, 1645-1646, 1653-1654, 1657-1658, 1661-1665, 1725-1726, 1749-1750, 1788-1789; R.E.#374, trial trans. pp 1903-1905, 1911, 1917-1920, 1922-1923, 1925-1926).

Jonathon's need for such attendant care will be ongoing—the brain damage he sustained is permanent, and no improvement is expected in such TBI patients after the first 12-14 months.  The demonstrated difficulties he has with daily living are thus also now permanent, and he has been unable to sustain productive skills enabling him to not only acquire but maintain employment, or to attend school on a consistent basis.  Boyce graduated

from high school due to having a lot of assistance, special attention and special arrangements made with regard to his behavior. At times, he has made some improvement with regard to the residual effect of the TBI; at other times not. The improvements he has made are directly attributable to the care and support he has received to date, but they have come with great difficulty because he tends to think he is okay, is an adult (and a physically large individual, weighing 220-230 pounds) and therefore has no need for a caregiver. As he has gotten older, he has desired more independence, and Ms. Armisted has had the troublesome task of trying to balance those desires with his indisputable need for supervision (R.E.#387, trial trans. pp 263-265; R.E.#386, trial trans. p 332; R.E.#380, trial trans. pp 1108, 1115; R.E.#375, trial trans. pp 1655-1657; R.E.#374, trial trans. pp 1906, 1912-1914, 1918, 1928-1931; R.E.#439, Dr. Meeland dep., pp 90-93, 95, 118-119; R.E.#419, Dr. Fankhauser dep., pp 21-22, 85-87, 90-91).

Because of his resistance to supervision and the attendant care the effects of his TBI compel his mother to provide, treating physician Dr. Fankhauser, a physiatrist, has gradually reduced the amount of care she has prescribed for Jonathon over time, from 24 hours per day to only four, rationalizing her decision in this respect by the fact that such a reduction was necessary because the reduced amount of care was all he would accept. The reduced

supervision periods have not worked out well, however. With increased

unsupervised time, Jonathon has gotten into various forms of trouble, due to

his impulsive behavior, lack of inhibition and inability to exercise good

judgment.  Thus, despite Fankhauser's prescriptions calling for reduced

attendant care/supervision on the basis of Jonathon's resistance to what he

actually requires (and Dr. Fankhauser testified unequivocally that he

requires more attendant care than she has prescribed), Pamela Armisted has

had to remain constantly available and on call because during unsupervised

times, Jonathon continues to expose himself and/or others around him to

danger without realizing he is doing so.  Ms. Armisted has had to keep track

of his whereabouts at all times, and should such problems arise, be prepared

to respond to the situation.  The fact that her efforts regarding care and

supervision have occasionally been unsuccessful doesn't mean that the

attendant care is not being given or is unnecessary.  Dr. Meeland testified

that successfully controlling a 20-year old with a TBI can be very difficult,

even if the caregiver has all the training in the world.  At other times, the

caregiver's efforts may prove very successful, but regardless of the degree of

success in the short term, the caregiver should always be there, attempting to

manage, modify and/or redirect inappropriate behavior for the safety and

well-being of her charge.  Without such support from his caregiver, Jonathon

Boyce would likely face a bleak future. Both Drs. Meeland, a psychiatrist whose practice focuses on patients with TBI's, and Gerald Shiener, a psychiatrist specializing in such patients, concur that Jonathon Boyce continues to actually require 24-hour attendant care due to the residual effects of his brain injury, despite Fankhauser's prescriptions calling for less care (R.E.#419,Dr. Fankhauser dep., pp 29-33, 35-38, 43, 45-53, 83-85, 88-89; R.E.#439, Dr. Meeland dep., pp 21, 58-59, 69-71, 114-115, 120-127, 132; R.E.#387, trial trans. pp 256-258; R.E.#386, trial trans. pp 306-307, 320, 324-325; R.E.#380, trial trans. pp 1099-1100, 1102, 1105; R.E.#375, trial trans. p 1657; R.E.#374, trial trans. pp 1930-1931, 1934, 1936-1938, 1940-1941, 1944-1945, 1953-1954).

## STATE FARM'S TREATMENT OF THE BOYCE CLAIM

At the beginning of Jonathon Boyce's claim, there was a priority issue between MIC/GMAC and State Farm with regard to which insurer was obliged to pay the no-fault benefits owed. MIC originally dealt with the claim and was paying attendant care benefits of $18/hr., 24 hours per day, from 12/13/02 through 12/31/05. After the courts determined that State Farm rather than MIC was obliged to pay the benefits, Michelle Garner handled the claim on behalf of State Farm. Defendant also received the entire MIC claim file at that time, and admittedly had all of the records

necessary to adjust the claim.  Ms. Garner described herself as the person at State Farm who would have been most familiar with the Boyce claim. Defendant was well aware from the materials contained within the claim file that Jonathon had sustained a catastrophic injury as a result of the auto accident which had produced the cognitive/emotional deficits discussed at length above.  *All* of the materials within State Farm's claim file indicated that Jonathon Boyce consequently required attendant care at the level of a life skills trainer/behavioral technician (a caregiver with an understanding of how to handle the cognitive, emotional and behavioral problems of a TBI patient), including the prescriptions from Boyce's treating physicians, MIC's prior assessment of the claim, and an attendant care evaluation from Renee LaPorte, an RN and experienced case manager.  Nothing in Defendant's claim file indicated that a lower level care provider such as a home health aide would even be capable of rendering the care Jonathon Boyce required. Defendant admitted, through Garner's testimony, that the level of care is supposed to be determined by the prescriptions of the treating physicians, and not independently by the insurer.  State Farm was also well aware and satisfied that Jonathon's mother, Pamela Armisted, was actually providing the care at the level he required prior to the time this litigation was instituted and that the attendant care benefits were therefore actually incurred

(R.E.#380, trial trans. pp 1047, 1049, 1053, 1065-1073, 1089, 1090, 1092, 1108-1114, 1116-1117, 1123; R.E.#375, trial trans. pp 1618-1619, 1626-1634; R.E.#371, trial trans. pp 2329, 2338; R.E.#448, M. Garner dep., pp 41, 48-49, 54-56, 58-65, 70-72, 84, 88, 108-109, 111, 113-114, 121, 123, 133-145, 148, 164-165, 191, 196-198, 200, 203-205, 210-211, 213; R.E.#443, R. Amend dep., pp 74-75, 148, 150).

However, despite the fact that MIC had been paying attendant care benefits of $18/hr. at the level of a life skills trainer and the fact that each of Boyce's treators had indicated that such care was what he required, claim representative Garner conducted a market "survey" of various healthcare agencies in the region to ascertain the value of care *for a home health aide, a decidedly lower level of care than Jonathon actually required.* The "survey" yielded a rate of $9.13/hr. for such a care provider, little more than half of the amount MIC had been paying.  State Farm was unable to establish that any of the healthcare agencies supposedly surveyed were advised that the care for which the survey was being taken was for a brain-injured individual, that such agencies could even provide a qualified caregiver for such a patient, or whether they would even send a home health aide to provide such care (R.E.#448,M. Garner dep., pp 42-43, 48-49, 61, 64, 164-172, 174-176).

In the course of her deposition testimony introduced at trial, Garner admitted that it was not proper to simply "run the numbers" for the value of care for a home health aide in the course of the survey. Given the fact that the prescriptions from Jonathon's treating doctors called for care at the level of a life skills trainer, the appropriate thing for Garner to have done would have been to conduct a survey for the value of care at that level. Garner agreed that as a higher degree of skill would be required to act in the capacity of a life skills trainer than a home health aide, the value of the former would exceed the result reached by the "survey" (R.E.#448, M. Garner dep., pp 164-170, 189-191, 197-198, 200-201, 203-205, 210-211, 213).

After this matter went into litigation in October, 2007, the handling of the Boyce claim, as well as all of the other claims involved in this case, was transferred to Ruthann Tuttle, who works in the multi-claim investigative unit, rather than the catastrophic claims unit Garner was part of. Tuttle was given all of the files involving a claimant represented by Plaintiffs' counsel in this action, although State Farm contends that claimants are not to be discriminated against on the basis of the law firm representing them. Tuttle initially contended in correspondence with Plaintiff's attorneys that it was questionable whether Jonathon Boyce had sustained injuries arising out of

the operation of a motor vehicle, even though the claim file offered no

support whatsoever for such a position.  Tuttle had reviewed very little of

the claim file prior to trial, although her position as the claim rep handling

the matter required that she be thoroughly familiar with its contents, and had

never spoken with Garner or any of Boyce's treating doctors regarding the

claim.  Although admitting that Jonathon's doctors' prescriptions for

attendant care should be important to an adjustor in evaluating the claim,

Tuttle simply adopted the position that there was no such thing as a life

skills trainer in Michigan with respect to attendant care.  She acknowledged,

however, that while her opinion in this regard was contrary to that of the

treating physicians (as well as RN/case manager Renee LaPorte), she made

no attempt to contact them to advise that their prescriptions for attendant

care were contrary to reality.  Tuttle admitted that MIC/GMAC had

recognized the existence of such caregivers with respect to this very claim,

and that she could not offer the opinion of even a single expert in the field to

support her view (R.E.# 380, trial trans. pp 1042-1044, 1048-1049, 1052-

1054, 1060-1070, 1073-1080, 1086-1087, 1094, 1109-1110, 1122-1123;

R.E.# 415, S. Schreurs dep., pp 97, 119-122; R.E.#417, R. Lynch dep., pt. II,

pp 76, 91; R.E.#437, D. Callahan dep., pp 189; R.E.#414, T. Iler dep., pp 71,

74-75; R.E.#420, K. Kuzmanko dep., pp 63, 69; R.E.#441, R. Proctor dep., pp 106-107, 138; R.E.#448, M. Garner dep., p 41).

Tuttle paid attendant care benefits on the Boyce claim at the lower rate arrived at by Defendant's "survey" from October, 2007 through January 31, 2008, then stopped paying. She attempted to justify paying no benefits at all by the fact that Ms. Armisted had had difficulties controlling Jonathon's behavior and he had consequently gotten into trouble involving the use of marijuana on two occasions; that he was attempting to maintain employment [without a great deal of success]; and that he had apparently disappeared for several days at a time. State Farm's position was that it should only have to pay for active, hands-on care that could be precisely documented in terms of what care was being provided during specific hours on any given day, and lacking such documentation, it had no obligation to pay attendant care benefits at all. Defendant's position in this respect, however, stood in stark contrast to its obligation to pay for all of the care that was reasonably required and not only that which was of a hands-on, active nature. State Farm had already admitted through the testimony of Michelle Garner that it was aware, in accordance with the testimony of Boyce's treating physicians and evaluating RN Renee LaPorte, that Pamela Armisted *had to be available at all times to monitor, supervise and manage his behavior if necessary,*

31

*since no one could predict when socially inappropriate behavior on his part might occur.* Even when the person is out in the community, or has simply taken off when he wasn't supposed to, the caregiver must still do her best to be aware of his whereabouts at all times and available to come to intervene or interact with regard to his behavior at any moment. No one disputed the fact that Boyce was difficult to control, but the fact that the caregiver's efforts might consequently prove less than successful did not mean that the requisite care was not being given or necessary. Nothing in Drs. Meeland or Fankhauser's reports indicated that Armisted was not doing a good job in providing care (R.E.#387, trial trans. pp 265-266; R.E.#386, trial trans. p 322; R.E.#380, trial trans. pp 1087, 1098-1101, 1103-1108, 1115, 1117-1119; R.E.#375, trial trans. pp 1649-1650, 1658-1660, 1742-1746, 1750-1751, 1797; R.E.#374, trial trans. pp 1911, 1914, 1927-1929, 1932-1934, 1940-1941, 1953-1954; R.E.#448, M. Garner dep., pp 196-197; R.E.#439, Dr. Meeland dep., pp 120-121, 123-127).

## TOWANDA PARKS

Towanda Parks sustained a severe TBI which initially left her comatose, and right hemiparesis, causing problems with the use of the right side of her body in an auto accident in December, 2002. Due to the latter, she was initially limited in her ability to ambulate, first requiring a motorized chair,

subsequently a wheelchair, and finally a cane. A neuropsychological evaluation conducted by board-certified neuropsychologist Dr. Bradley Sewick revealed that her full scale IQ following the brain injury was only 67, falling within the mentally retarded range, representing a very serious compromise of her ability to think on her own. Her memory score of just 47 indicated her memory was more impaired than her intellectual capacity. Her problem-solving ability was defective, as was her ability to respond adaptively and effectively to changes in her environment. The TBI also brought about impairment of her ability to regulate her emotions, impulse control, judgment and her ability to perceive that these deficits existed. Prior to the accident, Towanda Parks was married with four children, and had been very pleasant, sweet and easy to get along with. After the accident, she became very moody and irritable, subject to unpredictable angry outbursts with no apparent provocation. She is easily distracted by external stimuli and unable to maintain her focus in the face of such distractions. Due to the brain injury, she has also suffered from what treating physician and psychiatrist Dr. Gerald Shiener characterized as a diminished flow of thought, draining her energy and putting a damper on her ability to be spontaneous in particular and her thinking processes in general. She has become angry and frustrated nearly all of the time, and has demonstrated

difficulty in controlling those feelings in situations where a normal person would not. Her poor judgment manifests itself in acting without regard to her own safety. Because her sleep patterns are also disturbed due to the brain injury, Drs. Shiener and Sewick each prescribed 24-hour attendant care. Towanda is not capable of living on her own due to her impaired judgment and lack of self-control and inability to structure her day by herself. While she participated for a time in vocational rehabilitation under Dr. Sewick, doing so was quite difficult and Towanda was unable to continue working even on that basis (R.E.#377, trial trans. pp 1252-1253, 1255, 1258-1259, 1263-1266, 1271, 1273-1276, 1278, 1289; R.E.#376, trial trans. pp 1484-1487, 1489-1491, 1495, 1500-1501; R.E.#374, trial trans. pp 1818-1819, 1821-1825, 1829,1831, 1838, 1842-1843; R.E.#372, trial trans. pp 2283-2284; R.E.#411, T. Stein dep., pp 431-432).

The requisite skill level for Ms. Parks' attendant care provider would be that of a life skills trainer/behavioral technician, a caregiver who occupies a niche in health care in dealing with more complex types of patients, particularly those with emotional/cognitive problems, a higher level of care than entry level or basic attendant care. Her ex-husband, Gary Parks, who is very familiar with her and in whom she trusts, has with training and experience been able to serve as an equivalent caregiver for her. The life

34

skills trainer her condition requires would have to be able to divert her focus when she is subject to angry outbursts; to know how to talk her down and how to deal with her in a way that would not simply make her more frustrated and angry. The skilled caregiver would have to be able to monitor her behavior and be available on a 24-hour basis, understanding that her impaired judgment increases her propensity for engaging in dangerous activities. A caregiver lacking such advanced skills and who simply approaches her as if she was a responsible adult going through a difficult time, implying that she has actual control over what she's doing but is acting in willful manner, will only escalate the inappropriate behavior, causing her to become more agitated and out of control. While it is a benefit for her to live at home with her children and to be at least seemingly involved in raising them, the situation also creates a need on the part of Mr. Parks as her caregiver to strike a delicate balance in that regard. Due to her cognitive deficits, Towanda is not actually capable of raising her children, or even effectively assisting Gary in that task. Since she still views herself as a homemaker and mother, however, the situation calls for her caregiver to exercise some wisdom and creativity in allowing her to spend some time with her children, even though that time may not be as constructive as she feels it is. It requires a fairly sophisticated level of skill on the part of the

caregiver to allow her that time to preserve her sense of self-esteem without it proving detrimental to their welfare. After working extensively with Dr. Sewick and his staff at Spectrum Rehabilitation Centers, which primarily serves patients who have suffered TBI's, both Drs. Sewick and Shiener are quite satisfied that Gary Parks is performing his care duties at the level of a life skills trainer. While Mr. Parks was working as a cook at the time of the accident, he stopped working outside the home for several years thereafter to care for Towanda. Without Gary, Towanda would have ended up in residential or institutionalized care. Dr. Sewick emphatically demolished State Farm's self-serving notion that life skills trainers do not exist. He testified that they exist not only in Michigan, but all over the country. In fact, his rehabilitation company, Spectrum, employs them. Spectrum charges $45/hr. for such a caregiver's services, while the caregiver himself receives $15-$32/hr. plus benefits, which would include overtime and shift premiums (R.E.#377, trial trans. pp1276-1280, 1286-1290, 1304-1305, 1317-1319; R.E.#376, trial trans. pp 1487-1488, 1503, 1505-1509, 1517-1518, 1521-1524, 1532-1533, 1545-1546; R.E.#374, trial trans. pp 1820-1821, 1825-1826, 1828-1831, 1856, 1882).

Dr. Sewick testified that it is a very difficult task to provide the care that Ms. Parks requires on a daily, 24-hour basis. It is emotionally trying,

constantly challenging, stressful and unpredictable. As a consequence, Gary Parks started working again outside the home in June, 2005 to give himself a little break. He intentionally selected a partial midnight shift to work, from 11 p.m. to 3 a.m., because Towanda usually slept through that time period and he could remain on call and be available if needed, since his work location was only ten minutes away. At that time, Gary was only working two days out of the week, and his oldest son, Gary Jr., was 18, very familiar with her care requirements and old enough to watch her while he was away. Gary Jr.'s qualifications to serve as her caregiver would be similar to Gary's, as he would have passed his acquired expertise and knowledge on to him. Towanda is always with someone and is never completely alone, and Gary Parks remains on call and available to intervene, assist with and manage her behavior should the need arise (R.E.#376, trial trans. pp 1517-1518; R.E.#375, trial trans. pp 1782-1783; R.E.#374, trial trans. pp 1835-1837, 1839-1840, 1842-1843, 1854-1855, 1860; R.E.#372, trial trans. pp 2276, 2278-2281, 2284-2285).

## STATE FARM'S TREATMENT OF THE PARKS CLAIM

State Farm had no question that Towanda Parks had sustained a catastrophic injury in the course of the auto accident and that while her physical condition has improved, she has not recovered from the TBI and

continues to require attendant care with regard to her cognitive/emotional deficits. Defendant's claim file reflects that it anticipated that she would require lifetime care. After previous litigation with the Parks, State Farm agreed to pay attendant care benefits at the rate of $432/day, or $18/hr. Defendant was well aware of what a life skills trainer was, the care such a caregiver would provide, the fact that treating physician Eric Backos had prescribed 24-hour attendant care at the level of a life skills trainer as of at least 8/22/03, and was paying attendant care benefits at a rate commensurate with what would be paid for a life skills trainer and case manager to Mr. Parks. In fact, State Farm knew that a life skills trainer was required to render the proper level of care by 6/4/03. Nothing in its claim file indicated that there had ever been any subsequent change in that care requirement, and State Farm never questioned that such a caregiver was essential until the events that gave rise to this litigation. It also did not dispute the fact that a family member could serve as an equivalent caregiver. Further, State Farm made the benefit payments for Ms. Parks at $432/day because it had determined and was satisfied these benefits were reasonable, necessary *and incurred, certifying same to the Michigan Catastrophic Claims Association* (R.E.#411,T. Stein 4/4/08 dep., pp 313, 327-332, 360-361, 431-

434, 436-438, 442-447, 451-462, 471, 488-489, 539-541, 543, 545-548, 577-582; R.E.#374, trial trans. pp 1846-1850, 1852).

Arising out of the previous litigation between the parties as part of the settlement agreement in 2003 was also State Farm's promise that Gary Parks would not have to provide documentation regarding attendant care in the future, as no significant change was expected in Towanda's condition. State Farm has continued to pay benefits without specific documentation detailing the care provided since that time, despite recently requesting same (R.E.#429,Plaintiffs' Exhibit 138; R.E.#374, trial trans. pp 1846-1850, 1901-1902; R.E.#371, trial trans. pp 2363-2364, 2366).

However, State Farm conducted a so-called market "survey" in April, 2007 of three healthcare agencies at the direction of claim representative Tammy Stein. Contrary to Parks' doctors' stated requirements for her care and despite having no reason to believe a home healthcare aide would even be capable of providing the complex care Towanda requires, Stein directed her claims processor to perform a survey of the rates *for a home health aide.* Stein had considerable difficulty explaining why such a lower level of care was chosen, since she admittedly had no expertise with regard to the levels of attendant care and what level a given person might require, and nothing in the claim file indicated Parks' care requirements had changed from a life

skills trainer at all.  Defendant did not actually discuss Towanda' condition and specific care needs with any of the agencies it contacted, and no one from State Farm even asked any of these agencies to make a determination with regard to the level of caregiver they would actually place in the home. The results of Defendant's "survey" indicated that an appropriate rate of compensation for Parks' caregiver would be just $11.34/hr., or $272/day. On April 16, 2007, Stein wrote Plaintiff's counsel that it would begin making payments at the reduced rate on 5/1/07.  With the attendant care benefits substantially reduced, Mr. Parks had to begin working 40 hours per week on the midnight shift (R.E.#442,P. Semian dep., p 10; R.E.#411, T. Stein 4/4/08 dep., pp 320-325, 334, 456-458, 460-462, 520, 577-581, 584, 586, 591; R.E.#376, trial trans. pp 1511-1516; R.E.#374, trial trans. pp 1836-1837, 1850, 1853-1856, 1858, 1866, 1873, 1901-1902; R.E.#372, trial trans. p 2276; R.E.#371, trial trans. pp 2363-2364; R.E.#429, Plaintiffs' Exhibit 139).

In fact, representatives of the healthcare agencies State Farm allegedly "surveyed" uniformly testified that a home health aide would be incapable of satisfying Towanda Parks' care requirements and that they would not send out a lesser-skilled caregiver than the life skills trainer her physicians had indicated was required.  Each confirmed that no one from State Farm had

ever even discussed Parks' condition/care requirements with them, and they did not expect that rates quoted for home health aides in the abstract would be utilized by Defendant as a basis for establishing the value of the care Towanda requires. The rates quoted by State Farm to Plaintiff's counsel would be completely inappropriate as compensation for the level of care she requires, which would be a life skills trainer. It would not even be possible to provide an appropriate care giver for the amount Defendant proposed to pay (R.E.#442, P. Semian dep., pp 7-9, 10-15, 28-30, 32-33, 52-53; R.E.#444, W. Roe dep., pp 6-7, 10, 43-45, 49-57, 61, 75-78, 81-82, 87-88).

The Towanda Parks claim was transferred from claim rep Tammy Stein to Ruthann Tuttle, along with the other claims at issue. Interestingly, Stein testified that she had never even seen a case coming out of Plaintiffs' counsels' office that involved anything other than a catastrophic loss, cases where there was no question that the claimant had suffered horrible injuries and that the claim was completely legitimate. Of interest in this regard, Kathy Kuzmanko, Stein's team manager and supervisor, testified that State Farm had become far more conservative with regard to payment of no-fault benefits by 2003 than it had been in the past as a result of directives issued from senior management (R.E.#412,T. Stein 4/2/08 dep., pp 97-101, 107-109; R.E.#420, K. Kuzmanko dep., pp 222-225).

41

## JOSEPH CHAUVIN

Plaintiff Joey Chauvin was involved in a bicycle/automobile accident in 1993, when he was only five years old.  His mother, Kathleen Chauvin, found Joey lodged under the car, with the handlebars of his bicycle wrapped around his head.  He was screaming and combative until Mrs. Chauvin, afraid for his life, crawled under the car to try and calm him down and encourage him to stay still.  Joey sustained a skull fracture with a bleed into his brain, which required emergency surgery and a devastating traumatic brain injury.  Due to the TBI, he continues to suffer from the effects of depression, anxiety, impulse control problems, poor concentration, memory problems, moodiness and explosive, unpredictable outbursts of anger.  When a person sustains a brain injury at such a tender age, it has a tremendous effect on his development.  Joey's development has been impacted with regard to his emotions and personality, in addition to the expected cognitive deficits, which include an impaired ability to process social and verbal information.  His impaired concentration, memory, poor frustration tolerance and obsessive/compulsive disorder made it virtually impossible for him to be educated in a normal educational setting.  Neither public school nor a school which dealt specifically with children with TBI's was able to deal effectively with his behavior.  Because of the brain injury, Joey remains unable to

understand the nuances and subtleties involved in forming and maintaining

social relationships.  Those that he forms disintegrate rather quickly.  The

latter is a deficit which is not "fixable," as he is not capable of learning from

his experiences due to the TBI.  Consequently, Joey had to be home-

schooled through a program his treating neuropsychologist, Dr. William

Bloom, devised in conjunction with trained educators.  The education Joey

has been receiving has been on a one-to-one basis with individualized

instruction from highly skilled teachers in an environment with no

distractions, tailored in quantity to what he can handle on a weekly basis.

Due to his brain injury, progress has been limited, but it has been consistent

and he slowly makes gains (R.E.#384, trial trans. pp 447-449, 451, 454-456,

461-466, 482-484; R.E.#383, trial trans. pp 514, 529-530, 533-537, 556-558,

569-571, 575, 578, 581-582, 585-588, 600-602, 614-615, 630-632;

R.E.#380, trial trans. pp 1133, 1136, 1139-1146, 1159-1160, 1186, 1204).

    While Joey is now 21 chronologically, he is not 21 cognitively, socially

or emotionally due to the TBI.  Although he is at an age where he should be

able to experience a good deal of life independently and safely, he cannot do

so because he is prone to unpredictable fits of anger in the community and at

home which are completely inappropriate and/or out of proportion to the

stimulus that produces them; does not understand social conventions,

leading to socially inappropriate behavior; and is very impulsive and prone to exercising poor judgment on an equally unpredictable basis, conditions which without limitations placed on his behavior, can and have led to his engaging in very dangerous activities. Due to the TBI, his life must be very structured, with the same things happening in the same manner every day. His caregiver also cannot simply tell Joey to do something with any reasonable expectation that he will actually do it; instead, the caregiver must work with him to get him in a mood where he wants to do it (R.E.#384, trial trans. pp 461-462, 472-475, 480-481; R.E.#383, trial trans. pp 540-545, 558-559, 591-593, 595-599, 608-609, 611, 622; R.E.#380, trial trans. pp 1149-1150, 1160-1161; R.E.#375, trial trans. pp 1672-1673).

Due to the cognitive and emotional deficits noted above, both treating neuropsychologist Dr. Bloom and psychiatrist Dr. Sarcar testified that Joey Chauvin requires a high level of 24-hour attendant care. He suffers from depression and unpredictable hallucinations during the nighttime hours, and doesn't consistently sleep through the night, requiring his caregiver to be on call and available to try and calm him and help him through such episodes. His care requirements include first and foremost a caregiver with an understanding of his condition, the ways it can be manifested in daily behavior, and the ability to effectively manage that behavior. By necessity,

44

they also include supervision/monitoring on an ever-ready basis—his caregiver must *always be available to intervene with regard to his behavior at virtually any time*.  Because of his age, which produces an expectation of some independence, his caregivers must know when to place limits on him and when to take a risk that he is capable of handling a situation on his own, a delicate balancing act.  Part of the skilled caregiver's task is to work with Joey to assist him in learning to function in the community, to enable him to engage in some normal activities in public.  Since he is subject to depression, his caregiver must employ techniques to motivate him, to deal with his self-esteem and strive in some measure to get him at least partially integrated into the community.  The latter goal led to his involvement with acting/dramatic arts for a time, an activity which he loved.  The requisite skill set his caregiver must possess is beyond any reasonable dispute that of a life skills trainer, as treating Dr. Bloom and RN/case manager Renee LaPorte testified.  The value of care provided by a life skills trainer in the healthcare marketplace has a reasonable value of $30/hr. Through many years of experience of working, interacting and training with Joey's treating doctors and acting as part of his treatment team, there is no question that his parents have acquired and are implementing the skills of such a caregiver— they have learned to understand and how to best deal with the social and

cognitive deficits resulting from Joey's TBI over many years, and could

qualify to be life skills trainers with any home care agency as a result. Joey

has continued to receive that care to the present (R.E.#384, trial trans. pp

459-462, 467-471, 475-478, 485-486, 489, 498; R.E.#383, trial trans. pp

540-547, 551-552, 560-564, 572-573, 588, 595-599, 605-608, 615-616, 620,

653-657, 665, 672-673; R.E.#380, trial trans. pp 1135, 1147-1149, 1151-

1154, 1160-1164; R.E.#375, trial trans. pp 1667-1668, 1670-1674, 1795,

1797; R.E.#414, T. Iler 3/24/08 dep., pp 123-124).

## STATE FARM'S TREATMENT OF THE CHAUVIN CLAIM

The Chauvins have been through two prior lawsuits over benefits with

State Farm.  After the last litigation, Defendant agreed to pay $71,375 in

past attendant care and other no-fault claims through 12/31/01, and set forth

a payment schedule for the following five year period.  State Farm was to

pay $599/day at the start of that settlement agreement for not only family-

provided attendant care, but also for guardianship and case management, a

sum which rose to $695/day by 12/31/06.  Part of the last settlement

agreement  provided that

> "By way of additional consideration to the releasers, and by
>
> way of agreement, State Farm *obviates* the responsibilities of
>
> Kathleen Chauvin and/or her family members, their agents, servants

or assigns to provide documentation of the services being provided to
Joseph Chauvin for attendant care other than a responsibility to timely
notify State Farm in writing [of] Joseph Chauvin's death or any
periods during which he's hospitalized, institutionalized, or involve[d
in] a non-temporary change in domicile" (emphasis added).

It may be noted that "obviate," per the New Lexicon Webster's Dictionary,
means "to get rid of."  State Farm's Thomas Collins, the team manager supervising
claim rep Tracey Iler at the time she was handling this claim,  accordingly stated
unequivocally that ***there was no time limitation involved in that portion of the
settlement agreement.***  The agreement further stated that its terms would be
admissible in evidence in any subsequent litigation between these parties.  This last
provision of the agreement was extremely important to Kathleen Chauvin because
she had filled out extensive documentation for five years for State Farm regarding
the attendant care being provided, Defendant was very well aware of what was
going on in with respect to his medical condition, and nothing was expected to
change (R.E.#427,Plaintiffs' Exhibit 84; R.E.#383, trial trans. pp 623-629, 638-
639, 641-643, 659-662, 670-671; R.E.#377, trial trans. pp1333-1334; R.E.#371,
trial trans. p 2369; R.E.#421, T. Collins 7/21/08 dep., pp 7, 14, 16, 40, 55, 113-
119).

And Defendant was indeed well aware that Joey Chauvin suffered from the cognitive and emotional deficits set forth at length above, that those deficits were permanent in nature, of what his attendant care needs were and that those care needs would continue indefinitely into the future, based on his medical records and on reports submitted directly to it by Dr. Bloom on 10/18/06 and 9/19/07, Dr. Sarcar's letter of 7/28/06 and Renee LaPorte's attendant care evaluations of 10/31/98 and 4/12/07. By the time of the expiration of the previous settlement agreement regarding the amount of benefits to be paid for attendant care and the like, it was also quite clear to State Farm from the contents of its own claim file that nothing at all had changed regarding Joey's condition or care requirements, and that the level of care he required was that of a life skills trainer. Contrary to Tuttle's subsequent self-serving contention that life skills trainers didn't exist, State Farm had information within its own files indicating not only that it was a recognized level of attendant care, but one which was specifically included in Defendant's survey information regarding the relative values of attendant care. No one qualified to evaluate his requirements had even suggested that a home health aide of any level would be capable of handling the severe behavioral and cognitive problems involved in his care on a daily basis. Tracey Iler, the State Farm claim rep handling the matter until Ruthann Tuttle took it over, agreed that an adjustor would need to have an understanding of what the claimant's attendant

care needs were, and that it would be important to know what the treating doctors and evaluating nurses recommendations were in that respect. Yet when Iler conducted yet another so-called market "survey" regarding the value of the care being provided to Chauvin on or about 2/8/07, the level of care she surveyed was that of a home health aide 3, a caregiver with a significantly lower skill set. Of course, as Iler acknowledged, a home health aide 3 would be significantly cheaper than a life skills trainer, and reducing the amount paid out would assist in protecting the assets of State Farm. Consequently, the amount State Farm was paying for such care was reduced from $695/day (or $28.96/hr.) to $12/hr., or $288/day. Although the reality of the situation was that State Farm had an abundance of information regarding Joey's condition and care requirements to the point that it had in fact *waived* the need for any further documentation in the course of the earlier settlement, Iler attempted to justify this unilateral reduction in benefits on the basis that it lacked documentation regarding what care was being provided and who was providing it. Perhaps more in tune with reality are the undisputed facts that Defendant never spoke with any of the healthcare agencies allegedly "surveyed" with regard to the specific and intense care needs of Joseph Chauvin, and that Iler had no idea whether these agencies could even bring in a caregiver capable of dealing with such a patient. When deposed, Iler was unable to explain why she did not do any survey or otherwise investigate the value of care

provided by a life skills trainer. Iler and Collins also admitted they had no reason

whatsoever to doubt that Chauvin's parents had been and were continuing to

provide attendant care at the actual level he required, indicating benefits therefor

had been *incurred* (R.E.#414,T. Iler 3/24/08 dep., pp 67-68, 92, 99, 101, 104-106,

109-115, 117, 119-124, 126-128, 130, 133-141, 143-147, 149-151, 154-158, 163-

165, 177, 179; R.E.#421, T. Collins 7/21/08 dep., pp 139-140, 155; R.E.#384, trial

trans. pp 493-497, 506; R.E.#383, trial trans. pp 643-644, 648, 659-662, 669, 672,

677; R.E.#377, trial trans. pp 1333, 1351-1354, 1356-1358, 1365, 1372-1374,

1377-1378; R.E.#371, trial trans. pp 2368-2371, 2373, 2375-2377, 2379-2382,

2385, 2387-2388).

After Tuttle took over the handling of the Chauvin claim in October, 2007, she

initially didn't bother to even review the file's contents, and even indicated at her

deposition in this action that she had no intention of reading the file, although she

conceded at trial that her obligation to adjust the claim continued. Tuttle's

handling of the file establishes that State Farm's interest did not involve dealing

with the claim in good faith. Despite State Farm's indisputable knowledge to the

contrary, Tuttle sent out a series of letters to Plaintiffs' counsel from 11/07-5/08

questioning whether Joey Chauvin had even sustained an accidental bodily injury

compensable under the no-fault act. She subsequently hired Thomas Gola, PhD, a

psychologist, rather than a medical doctor, who was on Defendant's approved

"vendor" list and had an extensive history of testifying for numerous insurance companies, to perform a defense neuropsychological examination. Gola was paid $3,000-$3500 for his services to State Farm in this case, although he admitted he did not even conduct the actual neuropsychological testing of Joey Chauvin himself and that the test results were subject to interpretation (R.E.#384, trial trans. p 506; R.E.#377, trial trans. pp 1329-1330, 1339-1340, 1347, 1350, 1367-1368; R.E.#372, trial trans. pp 2088-2089, 2092-2093, 2100-2102, 2117-2119, 2129-2131, 2133-2134, 2136).

Gola claimed on direct examination by Defendant that Chauvin had no significant neurological deficits, and that from a strictly neuropsychological perspective, he saw no evidence based on his testing that Joey would need attendant care services. Gola, however, despite doing his best to pay homage to the entity that had paid for his opinion, was reluctant to stray too far from reality. He was more candid in admitting that there was no doubt that Joey had sustained a severe or significant TBI with possibly permanent deficits that had beyond any doubt contributed to the impairment of his cognitive abilities. Gola acknowledged that Chauvin continued to suffer from deficits consistent with the brain injury and that the nature of the injury probably had an impact on his cognitive development. This rather renowned defense psychologist also admitted that he had no physician-patient relationship with Joey, had no obligation whatsoever to treat him or even

assist him in seeking appropriate care, and could not even make any direct treatment recommendations to him. Gola unequivocally admitted he would be incapable of addressing Chauvin's medical and psychiatric care, and if Joey's treating physicians had prescribed attendant care, he would certainly be in no position to tell him to disregard those prescriptions. Gola was aware that Chauvin's treating doctors had indeed recommended 24-hour attendant care and he assumed Joey was receiving it. Gola also refused to even suggest that Joey's treators didn't know what they were talking about with regard to his cognitive deficits, and conceded that he would be unable to dispute their conclusions regarding the issues that had arisen from the psychological overlay in the years following the TBI. Gola was also unable to refute the facts of Joey's severe anger issues, that his behavior/poor judgment posed concerns regarding safety issues, and that he had learning difficulties and memory problems. Also irrefutable was the fact that further efforts to "remediate' Joey's underlying neurological deficits would not be advantageous (R.E.#372, trial trans. pp 2102, 2110-2111, 2113-2114, 2116-2119, 2122-2126, 2128-2129, 2140-2143, 2149, 2153-2161).

In fact, Gola felt that continued therapy **was** required for Joey, and was unwilling to retract the statement he made in his report that "behavioral difficulties appear to remain significant such as to warrant ongoing treatment and recommendation for 24-hour care." Dr. Gola rather steadfastly expressed his belief

that Joey should continue to be worked with in an effort to increase his skills and independence, focusing on areas where his performance may be deficient, in order to help him achieve a reasonably independent and self-sufficient lifestyle.  Gola believed that such care was reasonable and necessary and that State Farm should pay for it.  While Gola, in deference to his "employer" in this case, suggested that such care be provided by an occupational therapist, it may be readily be seen that it involves precisely the same kind and level of care his parents have been providing as life skills trainers (R.E.#372, trial trans. pp 2131-2133, 2153-2154, 2164-2166, 2168-2171).

Tuttle, however, seized upon Gola's report and the supposed lack of documentation of the care being provided as an excuse to cut off his attendant care benefits, never bothering to contact Dr. Bloom concerning his opinion regarding the continuing need for such care or attempting to resolve any conflict between Gola's written report and Dr. Bloom's findings.  In addition to terminating all attendant care benefits, Tuttle also stopped paying for cognitive therapy designed to assist Joey's reintegration into the community, which had included music therapy, dramatic arts therapy, individual therapy and group therapy as of October, 2008.  No one else from any other source had indicated that such therapies, established and recommended by Joey's physicians, weren't necessary for his rehabilitation.  It appears that Tuttle never bothered to even discuss the termination

of Joey's benefits at any length with Dr. Gola, as the latter was surprised at the

action taken by Tuttle.  Gola testified that his own report clearly indicated that

Chauvin had continuing treatment needs, and that Joey's continued participation in

dramatic arts would be highly recommended.  Even after being present in court to

hear Gola's live testimony and conceding that Joey Chauvin's treating physicians

would know more about his condition and care requirements than would Gola,

Tuttle refused to admit that she had made a mistake in cutting off all of Joey's

benefits.  Instead, Tuttle fell back upon State Farm's "mantra," wherein it

contended that, despite having had the benefit of volumes of medical records and

reports from treating physicians, as well as the depositions of virtually every

caregiver under oath in these cases, it lacked sufficient documentation to assess

what care was given by whom at what times simply because it didn't have a line or

two on its own form filled out, even where it had already determined after previous

litigation that no such documentation was necessary.  Interestingly, Tuttle declined

an opportunity repeatedly offered by Plaintiffs' attorneys to meet with each and

every one of the Plaintiffs in this action and speak with them and their counsel in

an effort to resolve any issues she might have with their claims (R.E.#384, trial

trans. pp 485-486, 489, 498-499; R.E.#383, trial trans. pp 545-547, 560, 650, 675;

R.E.#377, trial trans. pp 1341-1346, 1351, 1362-1363, 1372-1374, 1377-1378,

1382; R.E.#372, trial trans. pp 2142, 2144; R.E.#371, trial trans. pp 2431-2434, 2449).

## HAROLD AND JOSHUA ADAMS

Harold Adams was 47 years old when the subject auto accident occurred in 1995. Significantly, Mr. Adams sustained a TBI and a severed mesenteric artery, which supplies blood to the intestines. The latter injury necessitated removal of 90% of his intestinal tract, leaving him with a greatly shortened bowel, which meant that as soon as he ate, food would pass right through, leading to a near immediate need to defecate after eating and diarrhea. This condition also compromised his ability to absorb nutrients, necessitated a special diet and two injections of Sandostin daily by his wife, Eileen Adams, who has served as his caregiver since the accident, to attempt to slow down the passage of food through his intestinal tract and assist in the absorption of nutrients. As a consequence of the brain injury, Harold Adams cognitive/emotional functioning has been disrupted, resulting in anger containment problems and deficits in the areas of memory, concentration, impulse control and judgment. His thoughts are disorganized, leading to difficulties in planning and carrying out tasks. He has difficulty distinguishing between activities that are safe for him and those that are not, and maintaining his train of thought. In addition to giving him the twice daily injections, a task which indisputably falls within the category of skilled nursing

care, Eileen Adams worked with treating Dr. Gerald Shiener and Harold's other physicians to devise effective techniques for dealing with his behavioral problems, while still maintaining his sense of dignity and without treating him as if he was a child.  Per Dr. Shiener, Harold Adams required the level of attendant care that would be provided by a life skills trainer/behavioral technician on a 24-hour basis in light of his cognitive/emotional deficits (R.E.#376, trial trans. pp 1396-1399, 1401-1405, 1407-1408, 1410-1413, 1416, 1448, 1456; R.E.#375, trial trans. pp 1688-1689, 1790; R.E.#374 1959-1963, 1966-1967).

Plaintiff's expert RN/case manager Renee LaPorte (who served as case manager for the Adams' during the first year or so following the accident) did several attendant care evaluations with regard to Harold and Joshua Adams.  She testified that the elder Adams would like to be independent, and his need for independence must be taken into account and encouraged within practical limits by his life skills trainer/caregiver.  Even when that is being done and Mr. Adams is engaged in activities outside the immediate presence of the caregiver, the caregiver must remain available to intervene and interact with him if necessary.  Prior to the accident, Harold worked 6-7 days per week, 12 hours a day as a heavy machine operator and doing plumbing work.  He felt a tremendous sense of responsibility for the accident because he was driving when it occurred, and wanted to work afterwards out of an unrelenting sense of obligation to his family that would be

very hard for even the most responsible caregiver to continue to oppose over time

(R.E.#376, trial trans. pp 1416-1417; R.E.#375, trial trans. pp 1685-1687, 1693-

1694; R.E.#374, trial trans. p 1965; R.E.#373, trial trans. p 2054).

   Joshua Adams, Harold and Eileen Adams' son, was just eight years old when he

was riding with his father in the family car when this accident happened.  Joshua

also sustained a serious TBI, which required his attending neurosurgeon to drill a

hole in his skull to relieve escalating pressure and drain fluid build-up.  Joshua's

residual problems from the brain injury include deficits in the areas of judgment,

impulse control, maintaining an organized train of thought and unpredictable

behavioral difficulties, including substantial outbursts of anger and a propensity for

self-mutilation.  He has also attempted suicide a number of times due to feelings of

frustration, of being different from others and difficulties with impulse control.  He

was institutionalized several times, which had a pronounced negative therapeutic

effect, as he found it even more difficult to function in such an environment.  As a

result of the TBI,  Dr. Shiener testified Joshua requires an ongoing program of

psychiatric management, medication, counseling, behavior management and 24-

hour attendant care at the level of a life skills trainer/behavioral technician.

Because of the residual effects of the TBI, Ms. LaPorte concurred that Joshua

requires care at the level of a life skills trainer.  While his behavioral problems and

compromised impulse control and cognitive function indicate he should not be

driving or working in a competitive employment environment, Joshua is now a physically large 22-year old with overpowering concerns about whether he is as able as his peers.   His behavior would therefore be overwhelmingly difficult for Mrs. Adams to manage in these areas as his caregiver.  As with Harold Adams, it would be therapeutic to allow Joshua to perform tasks outside the home and his caregiver's immediate presence from time to time, but during such periods, his caregivers must be available and ready to intervene as necessary.  Eileen Adams has served as Joshua's primary caregiver, along with his girlfriend, Crystal. Eileen's long-term interaction and training with her son and husband's treating physicians and therapists, together with years of on-the-job experience, LaPorte testified, qualifies her quite well to serve in the capacity of a life skills trainer for them both.  Mrs. Adams in turn has trained Crystal to care for them both in the same capacity (R.E.#376, trial trans. pp 1417-1423, 1425-1432, 1470, 1475, 1478, 1481-1482; R.E.#375, trial trans. pp 1695-1699, 1753-1757, 1759, 1761-1762, 1783, 1788-1789, 1795, 1797; R.E.#374, trial trans. pp 1955-1960, 1972-1976; R.E.#373 1996-2000, 2015, 2041-2042).

Unfortunately, all of the Adams lied in their depositions taken in this cause, testifying falsely under oath that neither Harold nor Joshua were working, when in fact they were attempting to work multiple days per week in the family-owned plumbing and heating and cooling business run by Mrs. Adams.  Neither Dr.

Shiener nor Renee LaPorte had been advised that both the Adams were attempting to work in this manner. Joshua does the driving, is trying to learn plumbing work from other employees and does most of the heavy lifting required, but isn't sent out on a job on his own. Both Harold and Joshua also participated in a snow-plowing business purchased from another individual. Dr. Shiener, however, felt that the revelation that both were working made no difference in his findings with regard to their condition and care requirements. Shiener pointed out that the fact that they were doing so in the context of a family-owned business allowed far greater latitude regarding their level of performance, with much lower expectations than if they were attempting to engage in competitive employment. And in fact, the evidence introduced at trial substantiated the fact that the work they were doing was consistent with what one might expect from two seriously brain-injured individuals. They left a trail of problems concerning their work behind them, including severe plumbing leaks, a flooded basement, a gas leak, and forgetting to show up for at least one scheduled job. The snow plowing business lost customers, perhaps due to Harold and Joshua smashing up not only their trucks and plows, but also houses and a garage. The fact that Eileen Adams had little practical choice in "allowing" them to work did not mean that she was not providing the care required of her, however. Even during the time they were out of her immediate presence, she was on call and stayed in touch with them by phone to monitor their activities

59

and safety (R.E.#376, trial trans. pp 1408-1409, 1414-1415, 1430-1432, 1474;

R.E.#375, trial trans. pp 1753, 1768-1769; R.E.#374, trial trans. pp 1965, 1968,

1978-1979; R.E.#373, trial trans. pp 2001-2002, 2005-2007, 2011-2013, 2027-

2028, 2045-2046, 2049-2052, 2054, 2056, 2063-2066, 2076-2078).

## STATE FARM'S TREATMENT OF THE ADAMS' CLAIM

State Farm has admitted, through the testimony of Tuttle's supervisor, Claim

Team Manager Ronald Ikens, that there is no question whatsoever that each of the

individually injured plaintiffs in this action are entitled to no-fault benefits—the

only issue here is what no-fault benefits should be paid.  The Adams' claim was

one that Defendant expected to last for many years, and State Farm was well aware

that the injuries both Harold and Joshua had sustained were catastrophic in nature.

Defendant also acknowledged that none of the Adams' treating doctors have

prescribed less than 24-hour attendant care, and that those recommendations

should be followed.  After previous litigation, an agreement was reached in 2001

that $30/hr. would be paid by Defendant for the care of both Harold and Joshua,

and it paid that amount from 2002-2005 for 24 hours per day, less the time that

Joshua was in school in 2005, concluding that said amount was reasonable and

incurred.  State Farm's claim file included a report from Renee LaPorte indicating

that the level of care that was being provided by the Adams' family members since

the accident was that of a life skills trainer, which had a reasonable value of $30/hr.

as of 11/06 (R.E.#376, trial trans. pp 1548-1549, 1553; R.E.#412, T. Stein 4/2/08

dep., pp 40, 99-100, 150-156, 168, 173-175, 177, 186-187, 191-193, 215-220, 228-

229, 250-252, 254, 265-266, 286-287; R.E.#420, K. Kuzmanko dep., pp 92-94,

128-129, 133-135, 164-166, 171-172).

   In September, 2006, however, claim rep Tammy Stein conducted yet another

market "survey," allegedly contacting three healthcare agencies with regard to their

rates for the care that was required.  State Farm based its' "survey" not on the

value of a life skills trainer, but on a home health aide, and reduced the amount of

attendant care benefits being paid to just $10.50/hr., or $21.00/hr. for the care of

both Adams.  It is most interesting to note in this regard that Eileen Adams

administration of two injections of Sandostin per day for Harold Adams to

counteract the effects of his short bowel syndrome would, if not performed by a

family member, require the services of a trained nurse, and a single nursing visit

from a healthcare agency would result in a charge of $60-$80 twice per day, for a

minimal total daily cost for the injections alone of $120.  Defendant admitted that

the reduction from the aggregate rate of $30/hr. was not based on any documented

change concerning their care requirements.  As with the other Plaintiffs and

"surveys" involved in this action, no one at State Farm actually spoke with anyone

at any of the three agencies "surveyed" to see if they could actually provide care

for two people suffering from TBI's such as the Adams.  In fact, Brenda Lake, the

business and facilities manager for one of the agencies Defendant allegedly contacted to obtain market rates for the care of the Adams, indicated that her agency did not have anyone capable of providing 24-hour care for a TBI patient; that the physicians' orders, rather than the insurer, would be determinative of the proper level of care to be provided a patient; that State Farm had never provided any information regarding the condition of either Adams; if a treating physician had indicated that a home health aide would not be capable of dealing with patients such as Harold and Joshua Adams, her agency would certainly not send one out to provide care; and that Lake's agency, Mercy Home Care ("Mercy"), had never reached any determination as to the level of care either might require.  Further, Mercy would have charged $145 every time a nurse was sent out to a private home to provide skilled care, which would include the injections Harold required (R.E.#375, trial trans. p 1790; R.E.#412, T. Stein 4/2/08 dep., pp 222-223, 226, 244-250, 279, 286-287, 289, 291-292, 299-301; R.E.#420, K. Kuzmanko dep., pp 4-5, 10-14, 16, 21-22, 34, 36, 38-39, 41-42, 44).

State Farm started surveillance of the Adams in 2005, which revealed that they were working, but continued to pay attendant care benefits thereafter.  Tammy Stein, testifying live at trial, stated that if she had had that information, she would not have continued to pay the claim, but Stein had already taken a different stance at her deposition.  Therein, Stein acknowledged that TBI patients' caregivers

should strive to allow the person to function at their highest possible level, give them some independence, and allow them to do some work as long as the caregiver knew where they were and they were still being indirectly supervised.  Nothing in the Defendant's claim file would indicate that such indirect care should not be compensated, and indeed, State Farm continued to pay for 24-hour attendant care for a time after it knew the Adams were attempting to work (R.E.#371, trial trans. pp 2364-2366; R.E.#412, T. Stein 4/2/08 dep., pp 257-259, 261-263, 276).

## STATE FARM'S MOTIVATION

[This section has been redacted pursuant to the lower court's Order Denying Defendant's Motion for Protective Order, lower court document #69, and the Sixth Circuit's 5/18/10 Order entered in the instant action]

## **TESTIMONY OF DOREEN DILL**

Doreen Dill, a registered nurse, was hired by State Farm to regurgitate Defendant's stance with regard to each of these Plaintiffs' claims.  She had previously been retained by State Farm in another case where Defendant actually stated what her opinions would be in answer to interrogatories *eleven days before* the time she ever divulged those opinions to State Farm.  In that same vein, Dill was first retained to testify in the instant action by Defendant on 5/1/08, but State Farm listed her on its witness list filed over a year earlier!  Those few records she actually reviewed were those selectively supplied by State Farm, and shown to have been grossly incomplete in numerous respects.  In fact, the trial court ruled that Plaintiffs' counsel had established his point on cross-examination that Dill had reviewed nearly nothing, and largely precluded further questioning  in this regard. While she testified on direct examination that the rates for attendant care Defendant began to pay after the so-called market "surveys" were done in these cases were reasonable and appropriate, her testimony on direct was strikingly devoid of any consideration of the compelling behavioral/cognitive deficits which the treating physicians in these cases believed warranted the substantially higher skill set (and correspondingly higher value for the care provided) of a life skills

65

trainer (R.E.#372, trial trans. pp 2179-2180, 2199-2201, 2205, 2208, 2210-2211, 2216-2220, 2223-2224, 2244-2245, 2251-2252, 2261).

On cross-examination, Dill was forced to retreat from, if not outright abandon the positions she took on direct. She admitted she had not had any contact with any of the Plaintiffs' treating physicians or the Plaintiffs themselves; had not even attempted to contact any of the agencies involved in State Farm's so-called "surveys," even though she was aware that they were the supposed source of the rates Defendant had chosen to pay; seemed largely unaware of the substantial behavioral/cognitive problems each of the Plaintiffs suffered from; and conceded that she really didn't know what any of the individual care providers did on a day to day basis for the various Plaintiffs. Dill appeared to be completely unaware that the treating physicians had prescribed attendant care at the level of a life skills trainer because of the above deficits, as the pertinent records in this respect had not been provided to her by State Farm. To her credit, after having been enlightened on cross, Dill did indicate that the prescriptions and recommendations of the treating physicians in these cases should be followed; that each of these doctors would be better qualified than she to make a determination regarding the Plaintiffs' conditions and care needs (including that of Stewart's physicians' regarding two-person care); and that her "opinions" voiced on direct were contrary to those of the treating doctors with regard to the amount of care required and the level of care

66

that would be appropriate (R.E.#372, trial trans. pp 2224-2226, 2228-2251, 2255, 2257).  "ACE" in action.

On April 10, 2009, after a four week trial and less than a full day of deliberations (R.E.#370, trial trans. p 2658; R.E.#369, trial trans. pp 2673, 2677), the jury returned a verdict of no cause for action regarding Plaintiffs' no-fault claims, finding in each case that no allowable expenses under the no-fault act were incurred by any of the Plaintiffs (R.E.#369, trial trans. pp2677-2681).

Judgment of No Cause for Action was entered on 4/13/09 (R.E.#316).

Plaintiffs filed their Motion for New Trial Under Federal Rule of Civil Procedure 59(a) (R.E.#325) on 4/23/09, alleging in part pertinent to this appeal that the verdict regarding no-fault benefits was against the weight of the evidence.

The District Court denied the motion for new trial by its Order of 7/15/09 (R.E.#351) for the reasons stated on the record.  Plaintiffs filed their timely notice of appeal (R.E.#362) on 8/13/09.

## **SUMMARY OF ARGUMENT**

This Court should reverse the denial of Plaintiffs' Motion for New Trial based on the verdict being against the weight of the evidence because:

    (1) it is beyond dispute and Defendant admitted, contrary to the verdict, that each Plaintiff was entitled to no-fault benefits from State Farm, with the issue being what benefits should be paid; and/or

    (2) even if Defendant's construction of the verdict form and verdict could be sustained, the verdict was still against the overwhelming weight of the evidence regarding no-fault benefits being owed to Plaintiffs.

This Court should reverse the denial of Plaintiffs' Motion for Entry of Default Judgment for Defendant's Continued and Repeated Intentional Discovery Abuses where a willful and deliberate pattern of conduct designed to resist discovery was decisively shown and any lesser sanction would be inadequate.

## **ARGUMENT I**

### **THE JURY'S VERDICT AS TO PLAINTIFFS' NO-FAULT CLAIMS WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE, AND THE TRIAL COURT ERRED IN DENYING PLAINTIFFS' MOTION FOR NEW TRIAL.**

#### A. **STANDARD OF REVIEW**

A district court's denial of a motion for new trial is reviewed under an abuse of discretion standard, and the reviewing court will reverse where it has a definite and firm conviction that the trial court committed a clear error of judgment, *Mitchell v Boelcke,* 440 F3d 300, 303 (CA 6 2005); *McDonald v Petree,* 409 F3d 724 (CA 6 2005).

#### B. **ARGUMENT**

The trial court instructed the jury in part pertinent to this appeal with regard to the Plaintiffs' claims for benefits under the Michigan No-Fault Act that

> "If you decide no-fault benefits are owed to the Plaintiffs, you are instructed to award the benefits that have not already been paid by the Defendant as follows:
>
> Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for the Plaintiffs' care, recovery or rehabilitation arising out of the accident in question…" (R.E.#370, trial trans. pp 2650-2651).

To enable the jury to accomplish that task, the following verdict form was given to the jury (with changes only with regard to the dates of each Plaintiff's accident and the dates expenses were alleged to have been incurred concerning each respective Plaintiff; see R.E.#'s 318-323):

QUESTION NO. 1: Were allowable expenses incurred by or on behalf of the Plaintiff arising out of the accidental bodily injury caused by the automobile accident of _____:

(Allowable expenses consist of all reasonable charges for reasonably necessary products, services, and accommodations for the plaintiff's care, recovery, or rehabilitation.)

A. Answer: _____(yes or no)

B. If your answer is 'yes,' what is the amount of allowable expenses owed to the Plaintiff (include only the expenses incurred between _____to _____)?

$_____"

The jury answered "no" as to Question 1 A with respect to each and every Plaintiff, and accordingly made no determination in response to Question 1 B with regard to any of the Plaintiffs (R.E.#369, trial trans. pp 2677-2681).  In Plaintiffs' 4/23/09 Motion for New Trial and at oral argument of the motion on 7/13/09, Plaintiffs contended that as State Farm had repeatedly asserted throughout the

course of the trial that it didn't know whether care was actually being provided or at what level or during what time periods without its own attendant care forms being filled out by Plaintiffs, regardless of the extensive medical and lay testimony and other evidence dealing with that issue (See R.E.#388, Defendant's opening statement, pp 43-45, 48-49, 52; testimony of  R. Tuttle, R.E.#382, pp 833-834, 839, 842; R.E.#381, pp 873, 875-883, 888-890, 896, 951, 972; R.E.#380, pp 1098-1101; R.E.#377, pp 1354, 1372, 1377-1378; R.E.#371, pp 2429-2430, 2432-2434, 2440-2442, 2449; testimony of R. Ikens, R.E.#376, pp 1560-1561, 1564-1565, 1573, 1577, 1579, 1583, 1589, 1591, 1595-1597; R.E.#371, live testimony of M. Garner, pp 2332-2336, 2338-2342, 2345-2346, 2350-2353, 2356; R.E.#371, live testimony of T. Stein, pp 2363-2364; R.E.#371, live testimony of T. Iler, pp 2369-2371, 2373-2382, 2385, 2388; R.E.#370, Defendant's closing argument, pp 2584-2585, 2590-2593, 2595, 2597-2599), Question 1 A was designed to have the jury determine exactly what it stated: whether *any* allowable no-fault expenses had been incurred.  Question 1 B was then intended to have the jury determine whether Defendant owed additional benefits beyond those already being paid by State Farm, the damages Plaintiffs sought in filing this litigation (R.E.# 325, pp 5-15; R.E.# 353, pp 5-8, 38, 40, 46-47, 49-53).

   That Plaintiffs' construction of the verdict form is correct should be rather obvious:  Question 1 A does *not* ask whether "additional" allowable expenses had

been incurred beyond those State Farm already paid. Instead, that determination was clearly left to Question 1 B. If in fact the jury had found only that the additional no-fault benefits Plaintiffs sought in this action were not owed by State Farm, the jury should have answered "yes" to 1 A, but indicated that the amount of allowable expenses owed to Plaintiffs was "$-0-." Instead, by the verdict form, the jury quite clearly indicated that it found no allowable expenses had been incurred at all. Significantly in this regard, Defendant's trial counsel, Mr. Hewson, stated at the hearing on Plaintiffs' Motion for New Trial that the motion should be denied because Plaintiffs hadn't produced "any evidence" that services were performed, which was directly related to whether allowable expenses had been incurred (R.E.# 353, p 25), an interpretation of the verdict that is entirely consistent with Plaintiffs' own. Further, State Farm applied the verdict to its continuing obligation to pay benefits as losses accrued under MCL 500.3142(1) as if the jury had determined that no benefits whatsoever were payable, including those which it had previously conceded were due and owing—Defendant's counsel candidly conceded in response to the trial judge's questioning that other than with regard to Leslie Stewart, none of the other claimants were being paid attendant care benefits at all following the verdict (hearing on motion for new trial, R.E.# 353, pp 41-42). Presumably State Farm continued to pay Stewart because its Claim Team Manager, Ron Ikens, who was in charge of this litigation, admitted at trial that he

knew that Stewart couldn't survive without care, that Stewart was receiving care, and Defendant's own surveillance established he was receiving care (R.E.#376, trial trans. pp 1548, 1577, 1579).

Defendant's co-trial and current appellate counsel, Mr. Gross, obviously realizing the ramifications of adopting such a position with regard to the verdict, understandably preferred to characterize  Question 1 A as dealing with the issue of whether State Farm owed any additional benefits to Plaintiffs beyond those which it had already paid, despite the fact that the question itself is decidedly not phrased in such terms (R.E.# 335, Defendant's Answer to Motion for New Trial, pp 7-8; R.E.#353, 7/13/09 hearing on motion for new trial, pp 41, 47, 53).  Regardless of how the verdict form and jury's verdict is construed, however, this verdict was clearly against the overwhelming weight of the evidence.

Discussing the issue first with regard to Plaintiffs' construction of the verdict, based on the clear language of the verdict form and Defendant's interpretation of the verdict in paying nothing on the claims following trial, there can be no question whatsoever that the verdict was unsupportable.  The jury's decision that no allowable expenses whatsoever were incurred is patently absurd.  Ron Ikens, who was in charge of this litigation on Defendant's behalf,  decisively resolved that issue to the contrary by  admitting *each* Plaintiff was entitled to no-fault benefits from State Farm—the issue here was what no-fault benefits should be paid

(R.E.#376, trial trans. pp 1548, 1553).  Without even dealing with any credibility issues that could conceivably arise concerning Plaintiffs' proofs, Defendant's own surveillance of Stewart established he was receiving care (R.E.#376, trial trans. pp 1589-1591), and Ikens admitted with regard to Stewart that State Farm knew Leslie was receiving 24 hours of care 7 days a week (R.E.#376, trial trans. pp 1587-1588).  With regard to the Boyce claim, Defendant's claim rep Michelle Garner unequivocally testified that prior to and also *during* this litigation, she was satisfied that Pamela Armisted was providing care and benefits were therefore being incurred (R.E.#448, M. Garner dep., pp 108-109, 122-123, 133-137).  Similarly with regard to the Parks' claim, claim rep Tammy Stein not only admitted  benefits were being paid prior to and through the course of this litigation and that Towanda was continuing to receive 24-hour attendant care, but also *certified* those facts to the Michigan Catastrophic Claims Association (R.E.#411, T.Stein 4/4/08 dep., pp 541, 543, 545-548).  Concerning the Chauvin claim, claim rep Tracey Iler admitted that she had no reason to doubt that Chauvin's parents were providing attendant care (R.E.#414,T. Iler 3/24/08 dep., p 157), and defense medical examiner Gola conceded his inability to challenge the care requirements set forth by the treating physicians or the fact that Joey was receiving that care (R.E.#372, trial trans. pp 2124-2125, 2131-2133, 2140-2141, 2149, 2160-2161).  Even with regard to the Adams and giving due consideration to the fact that all lied at their depositions

about Harold and Joshua working, the unassailable fact remained that Mrs. Adams was providing care at a nursing level in giving her husband 2-3 injections of Sandostin per day in an attempt to minimize the consequences of his short bowel syndrome.  The unchallenged testimony regarding the value of such care indicated that same would be a minimum of $120/day (R.E.#375, trial trans. pp 1688-1689, 1790, 1962-1963).

Michigan's No-Fault Automobile Insurance Act ("the No-Fault Act;" or "the Act"), MCL 500.3101 *et seq* was enacted in 1973.  The goal of the statute was to provide victims of auto accidents with "assured, adequate and prompt payment for economic losses, *Miller v Farm Bureau Mut. Ins. Co.,* 218 Mich App 221; 553 NW2d 371 (1996).  MCL 500.3107 provides in pertinent part that personal protection insurance benefits are payable for

> "(a) Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."

The Act does not require that attendant care be supplied by trained medical personnel; rather, a no-fault insurer is obliged to pay a family member for all reasonable charges incurred for reasonably necessary attendant care services rendered at home.  *Van Marter v American Fidelity Fire Ins. Co.,* 114 Mich App 171; 318 NW2d 679 (1982); *Visconti v DAIIE,* 90 Mich App 477; 282 NW2d 360

(1979). Such expenses are presumed to be provided at their reasonable market value, and comparison to rates charged by institutions provides a valid method for determining whether the amount of an expense was reasonable and for placing a value on it. *Manley v DAIIE,* 127 Mich App 444; 339 NW2d 205 (1983).

To qualify as an "allowable expense," the Act requires that three factors be met: (1) the charge must be reasonable; (2) the expense must be reasonably necessary; and (3) the expense must be incurred. *Nasser v Auto Club Ins. Ass'n.,* 435 Mich 33; 457 NW2d 637 (1990). Only the latter is at issue on appeal here.

In *Proudfoot v State Farm,* 469 Mich 476, 484; 673 NW2d 739 (2003), the Court held that "incur" means "to become liable or subject to, especially because of one's own actions. In *Burris v Allstate Ins. Co.,* 480 Mich 1081; 745 NW2d 101, 104 (2008), Justice Corrigan discussed this concept further in her concurrence, stating:

> "Under *Proudfoot,* the term 'incur' does not mean that an insured must necessarily enter contracts with the care provider to be entitled to reimbursement for attendant-care expenses…Nor does it mean that an insured must necessarily present a formal bill establishing that the attendant-care services were provided. It merely means that the insured must have an obligation to pay the attendant-care service providers for their services…

> [T]o incur an expense for attendant-care services, the insured's
> family members and friends, just like any other provider, must perform the
> services with a reasonable expectation of payment."

That the caregivers had a reasonable expectation of payment has never been at issue here; thus Michigan law only requires in the present context that the services have been provided.  As noted, there is no question the latter occurred in the present case.  It may be surmised that the jury reached the erroneous conclusion it did here as a result of  Defendant's trial strategy regarding the supposed lack of documentation resulting from Plaintiffs' failure to complete its own forms.  That "strategy," however, misstated the law in Michigan, which as State Farm admits, requires no such documentation (Defendant's Answer to Motion for New Trial, Doc. 335, p 2, fn. 1).  See also *Buntea v State Farm,* 2007 WL 3275053 (ED Mich), where Judge Edmunds ruled at p4 that

> "[N]othing in Michigan law requires a plaintiff to have hard
> documentary evidence of care, as personal testimony of care provided
> by family and friends is sufficient evidence upon which a jury could find
> that the plaintiff incurred those expenses," citing *Booth v Auto-Owners Ins.*
> *Co.,* 224 Mich App 724; 569 NW2d 903, 905 (1997).

The cumulative effect of Defendant's pervasive assertion of its misleading documentation argument apparently caused the jury to deliberate under a

fundamental misunderstanding of the meaning of the term "incurred," because it is beyond rational dispute that care was indeed provided in each and every Plaintiffs' case. The evidence thus compelled a finding that Plaintiffs had incurred allowable expenses, and the trial court erred in failing to grant them a new trial on this basis. A new trial should be granted when the verdict is against the clear weight of the evidence, i.e., where a reasonable juror could not have reached the challenged verdict. *Taylor v Teco Barge Line, Inc.,* 517 F3d 372 (CA 6 2008); *Denholf v City of Grand Rapids,* 494 F3d 534 (CA 6 2007). Where the evidence is very slight in favor of the verdict and that in opposition thereto very strong, a new trial on the basis that the verdict is against the weight of the evidence is warranted, *Hawley v Dresser Industries, Inc.,* 958 F2d 720 (CA 6 1992). *Holmes v City of Massillon, Ohio,* 78 F3d 1041(CA6 1996) held that when a verdict is against the weight of the evidence, there is a duty to grant a new trial to prevent a miscarriage of justice. There can be no doubt those standards were met here.

Even in the event Defendant's construction of the verdict form and the verdict could be sustained, the result would be the same. Based on the facts set forth in the Statement of Facts above (which must be incorporated by reference rather than restated, due to word/number limitations placed on this brief), it is eminently clear that each of these TBI claimants required care that only a life skills trainer could provide, on an on-call basis, and that such care was in fact provided. The evidence

clearly demonstrated that each was in effect a ticking time bomb who might unpredictably explode into anger or impulsively venture into activities which were unsafe for themselves and/or others around them at any time. In Leslie Stewart's case, these characteristics, coupled with his physical size, meant that two caregivers were required to be on call whenever he might need to be transferred or require other care. No qualified person had ever indicated anything to the contrary to State Farm. The "market surveys" Defendant allegedly based its reduction of the compensable rates of care on were shown to have been devoid of factual support. In effect, the evidence conclusively demonstrated that State Farm made a policy decision to deny Plaintiffs' claims for additional benefits without regard to the actual facts. Such decisions are improper as a matter of law, *McKelvie v Auto Club Ins.,* 203 Mich App 331; 512 NW2d 74, 77 (1994), making it eminently clear that this jury verdict represented a serious miscarriage of justice. Similarly, an insurer acts improperly and unreasonably when it bases its refusal to pay benefits on personal beliefs which are not grounded in fact or are in conflict with the opinions of the treating physicians. *Tennant v State Farm,* 143 Mich App 419; 372 NW2d 582, 587-588 (1985). The same is true where all of the actual facts relevant to the claim are known and in the hands of the insurer, yet the insurer clings to the most tenuous basis to deny the claim and refuse proper payment. *Grand Valley*

*Health Center v Amerisure Ins. Co.,* 262 Mich App 10; 684 NW2d 391, 400-401 (2004).

With regard to Defendant's contentions that the times at which the various caregivers were providing care was in question, all of the care at issue was required to be provided on an on-call basis. Where such care is required, the insurer is not permitted to use a "stop-watch" method of computation to determine the value of services rendered. Instead, being available to give care when the need for it can arise suddenly and unpredictably, is compensable when it is necessary. *Morris v Board of Education,* 243 Mich App 189; 622 NW2d 66 (2000); *Brown v Eller Outdoor Advertising Co.,* 111 Mich App 538; 314 NW2d 685 (1981); *Filion v Art Himbalt Trucking Co.,* 103 Mich App 471; 302 NW2d 892 (1981).

Thus, either way the jury's verdict/verdict form are construed, it is clear that the trial court erred in denying Plaintiffs' motion for new trial. The trial court's stated reasons for denying the motion-- that the case went to the jury as the attorneys wanted it to, consistent with the jury instructions that were drafted and agreed to by counsel (7/13/09 hearing on Plaintiffs' motion for new trial, Doc. 353, p54) fail even to meet the requisite standard for deciding such a motion: in ruling on a motion for new trial based on the weight of the evidence, the trial court must compare the opposing proofs, weigh the evidence and set aside the verdict where it may be fairly determined that the verdict is against the clear weight of the

evidence. *McDonald, supra,* at 409 F3d 727; *J.C. Wyckoff & Associates v Standard Fire Ins. Co.,* 936 F2d 1474, 1487 (CA 6 1991).

## ARGUMENT II

**THE TRIAL COURT ERRED IN FAILING TO GRANT A DEFAULT JUDGMENT FOR DEFENDANT'S WILLFUL ABUSE OF DISCOVERY.**

### A. STANDARD OF REVIEW

A trial court's decision re Rule 37 sanctions is reviewed for an abuse of discretion, *Tisdale v Federal Express Corp.,* 415 F3d 516, 525 (CA 6 2005). However, while the trial court's decision in this respect will only be disturbed for an abuse of discretion, the appellate court should not automatically affirm. The reviewing court is remiss in its duties if it chooses to merely rubber stamp the lower court's order. It is obligated to consider the full record, as well as the reasons assigned by the trial court for its judgment, and to reverse the judgment below regarding sanctions if it has a definite and firm conviction that the lower court committed a clear error of judgment. *Wilson v Volkswagen of America, Inc.,* 561 F2d 494, 505-506 (CA 4 1977).

### B. ARGUMENT

Plaintiffs' Motion for Entry of Default Judgment for Continued and Repeated Intentional Discovery Abuses (R.E.# 155), filed pursuant to FRCivP 37(b)(2), set forth in exacting detail 18 instances of Defendant's willful and intentional abuse of the discovery process and/or dedicated efforts to force Plaintiffs' to incur substantial additional expenditures in time and money in

litigating this action.  Because this matter includes the claims of *six* traumatically brain injured claimants for attendant care benefits under the Michigan No-Fault Act, MCL 500.3101  et seq, and the facts of each of their claims is of extreme importance in relation to the issue of whether the jury's verdict was against the overwhelming weight of the evidence, it is not possible to set forth the facts relating to each such instance separately here due to the word limitations placed on this brief, and Plaintiffs out of necessity must rely upon the facts set forth in the Motion.  In ruling upon the motion after its referral, Magistrate Judge Scheer chose to focus on four discovery abuses which he found worthy of note, as discussed at length in his Report and Recommendation (R.E.# 219).  In his report, Judge Scheer ruled that State Farm had acted out of willfulness in three of those four (R.E.#219, pp 4-6, 15).  As to the fourth, regarding production of Defendant's Special Investigative Unit ("SIU")/MCIU project files, the magistrate concluded that despite serious doubts regarding the validity of any such privilege, Plaintiffs had failed to challenge Defendant's assertion that even the mere existence of such files was privileged by filing a motion to compel prior to filing the motion for default (R.E.# 219, pp 13-15).  However, Magistrate Scheer recommended that sanctions other than default judgment be imposed, based upon his opinion that Plaintiffs had shown no prejudice to their ability to litigate the case on its merits and that Defendant had not previously been admonished that its misconduct concerning

discovery could lead to default (R.E.# 219, pp 16-17). Magistrate Scheer did conclude that State Farm's conduct was sufficiently egregious and obstructive to warrant substantial monetary sanctions (R.E.# 219, p 17).

   Plaintiffs filed their Objection to the magistrate's report (R.E.# 227), asserting that a default judgment was justified in light of his finding that State Farm had willfully failed to comply with discovery because: (1) Judge Scheer's entry of prior orders compelling discovery in relation to the abuses thereof pled in Plaintiffs' motion, which were ignored by Defendant (see R.E.# 155, pp 6, 10-12, 15, 17, 20-21) were sufficient to advise it of the possibility of default under *Bank One of Cleveland, N.A. v Abbe,* 916 F2d 1067, 1079 (CA 6 1990); (2) that the totality of the Defendant's discovery abuses had severely prejudiced Plaintiffs' ability to prosecute this case because they had thereby been prevented from effectively questioning State Farm personnel regarding their conduct in handling Plaintiffs' claims and demonstrating for the jury at trial that Defendant had trained or directed its claims personnel to violate the Michigan No-Fault Act by wrongfully reducing and denying legitimate claims (R.E.# 227, pp 5-9); (3) with regard to Defendant's SIU/MCIU project files, Judge Scheer's ruling had ignored the Plaintiffs' thorough discussion of the issue of privilege in Plaintiffs' previous motion for entry of default (R.E.# 98), which Plaintiffs had adopted in the subject motion for default judgment (R.E.# 155, p 3), that State Farm had so thoroughly hidden the

84

documents that their existence was not discovered until the eleventh hour, and that the burden of establishing the existence of any alleged privilege rested with Defendant, *In re Grand Jury Investigation No. 83-2-35,* 723 F2d 477 (CA 6 1983), rather than with Plaintiffs; and (4) any sanction short of default would be ineffective, since State Farm had a total net worth in the area of $58 billion, giving it sufficient financial resources to absorb a monetary sanction with near impunity (R.E.# 227, pp 10-11, 13-16).

Judge Tarnow's 1/9/09 Order (R.E.# 271) accepted Scheer's report and recommendation, denied the motion for default judgment, accepted the recommendation that substantial monetary sanctions be imposed upon State Farm, but reserved ruling on the appropriate sanction to be imposed. To date, no sanctions at all have been imposed.

The Sixth Circuit set forth the standard for imposition of a default in *Bank of Cleveland, supra,* at 916 F2d 1073*: (1) whether the party's failure to cooperate in discovery is due to willfulness, bad faith or fault; (2) whether the party's adversary was prejudiced by such failure; (3) whether the party was warned that failure to cooperate could lead to default; and (4) whether less drastic sanctions were imposed or considered before default was ordered. Judge Scheer's findings with regard to (1) willfulness on State Farm's part are beyond reasonable dispute, as is his conclusion regarding (4), that the criterion concerning less drastic sanctions

85

were first imposed or considered.  The entry of prior orders compelling discovery in relation to the abuses thereof outlined in the motion for default judgment is by law sufficient to satisfy the third criterion above under *Bank of Cleveland,* 916 F2d at 1079.

That the second criterion was also met is similarly beyond challenge.  Most of the discovery information wrongfully withheld from Plaintiffs went to their counsels' ability to effectively question State Farm claims handling personnel regarding Defendant's claim handling practices, and the hotly contested issue in this litigation as to whether State Farm directed its adjustors to wrongfully reduce or deny legitimate claims for attendant care benefits.  *Morales v State Farm Mut. Ins. Co.,* 279 Mich App 720; 761 NW2d 454, 461 (2008); lv den expressly held that the issue of whether State Farm had fairly reviewed plaintiff's claim for no-fault benefits was relevant to whether his claim was denied for legitimate versus illegitimate reasons under the Michigan No-Fault Act.  Undeniably, Plaintiffs were entitled to a full opportunity to investigate all of the evidence in that regard and place same before the jury.  State Farm's willful conduct in obstructing discovery denied them that opportunity.  In addition, such evidence would have been directly relevant to the issues of whether proper payment of benefits was overdue, thus entitling Plaintiffs to 12% penalty interest under MCL 500.3142, and to Plaintiffs' entitlement to attorney fees based upon Defendant's unreasonable refusal to

86

properly pay the benefits at issue in these cases under MCL 500.3148(1).

Prejudice was beyond question here.

There is also no question that State Farm's conduct regarding discovery amply demonstrated a deliberate course of conduct designed to deny, delay and frustrate Plaintiffs' discovery requests and ability to successfully litigate this action.  Where it has been demonstrated that a party had willfully made every attempt to frustrate and defeat discovery efforts and deliberately chose to confuse and impede the progress of the litigation, entry of default judgment is an appropriate sanction, *Michigan Window Cleaning Co. v Martino,* 173 F2d 466, 467-468 (CA 6 1949); *Trans World Airlines, Inc. v Hughes,* 332 F2d 602 (CA 2 1964); *Shawmut Boston Intern. Banking Corp. v Duque-Pena,* 767 F2d 1504, 1507 (CA 11 1985); *Pauley v United Operating Co.,* 606 FSupp 520, 525-526 (ED MI 1985).  Similarly, imposition of default was found to be appropriate where the defendant's conduct demonstrated willful and deliberate disobedience of discovery orders, willful concealment of evidence and attempted fabrication of false evidence.  *Shearson Loeb Rhoades, Inc. v Quinard,* 751 F2d 1102 (CA 9 1985).  Further, the fact that, as here, efforts to comply with discovery came only after its closing is a factor supporting imposition of default judgment, *Pauley, supra,* at 606 FSupp 525.

Simply stated, the salient facts regarding State Farm's staunch resistance to discovery could hardly be more supportive of the severe sanction of default

judgment here.  Plaintiffs assert that no other sanction would or could have been adequate to remedy such misconduct, and the trial court erred in failing to grant a default.

## <u>CONCLUSION</u>

Plaintiff-Appellants pray this Honorable Court enters its order:

(1) reversing the trial court's order denying their motion for new trial and

    remanding for retrial; and/or

(2) reversing the trial court's denial of their motion for default judgment and

    remanding for a determination of damages suffered by Plaintiffs.

Respectfully submitted,

s/Larry A. Smith
Attorney for Plaintiff-Appellants
24750 Lahser Road
Southfield, MI 48033
(248) 358-3920
lasmithlaw@yahoo.com

Dated: April 7, 2010

# <u>CERTIFICATE RE COMPLIANCE</u>

Due to the extremely voluminous nature of the trial court record ( including a four-week trial, 4,000+ pages of testimony introduced at trial, including depositions read into the record or shown in video form to the jury, from more than 41 witnesses, many of whom testified more than once due to the fact that this action involves not one but six traumatically brain injured plaintiffs, each of whom sought attendant care benefits under the Michigan No-Fault Act based upon the complex nature of their own particular injuries, condition, medical treatment and individual need for such care), this brief contains 17,895 words, exclusive of its citations to the record entries in the trial court. The word limitation set forth in F R App P 32(a)(7) has been exceeded because the primary issue involved in this appeal is whether the trial court erred in failing to grant Plaintiffs' motion for new trial based on the fact that the verdict *with regard to each of the six individual claim* was against the overwhelming weight of the evidence. As the vast majority of the extensive testimony introduced at trial regarding these six plaintiffs is quite relevant to that issue, Plaintiff-Appellants' counsel has done his utmost to present that evidence as concisely as possible, since this Honorable Court certainly cannot be expected to carefully scrutinize each of those 4,000+ pages (performing this task alone required well over 200 hours by the undersigned). It is believed that that the breakdown of the word count reflects those efforts, as only 4100 words

have been employed in the two arguments presented, compared to 13,000 in the

Statement of Facts, which encompasses each of the six plaintiffs' claims (a number

reached only after exhaustive efforts to pare that statement down to manageable

size—Plaintiffs' counsel's summary of the trial testimony was 345 pages in

length).   Counsel would be remiss in his obligations to his clients if he sought to

meet the word limitation set forth in the rule at the expense of a professional,

thorough and complete presentation of the substance of that evidence, and this

Court would have been deprived of the ability to make an informed ruling

regarding this issue had he done so.  Consequently, a motion to extend the word

limitation with regard to their brief is being filed with the brief, which Plaintiff-

Appellants most respectfully pray be accepted for filing.


Respectfully submitted,


s/Larry A. Smith
Attorney for Plaintiff-Appellants
24750 Lahser Road
Southfield, MI 48033
(248) 358-3920
lasmithlaw@yahoo.com

Dated: April 7, 2010

## **CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of Plaintiff-Appellants' Brief on Appeal was served upon each attorney or party of record herein by electronic means or first class U.S. Mail on April 13, 2010.

<div style="margin-left:50%">

s/Larry A. Smith
LARRY A. SMITH (P27989)
Attorney of Plaintiff-Appellants
24750 Lahser Road
Southfield, MI 48033
(248) 358-3920
lasmithlaw@yahoo.com

</div>